No. 23-55367

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

LANA RAE RENNA; DANIELLE JAYMES; HANNAH SPOUSTA; LAURA SCHWARTZ;
MICHAEL SCHWARTZ; RICHARD BAILEY; JOHN KLIER; JUSTIN SMITH; JOHN PHILLIPS;
PWGG, L.P., A CALIFORNIA LIMITED PARTNERSHIP; CHERYL PRINCE; DARIN PRINCE;
NORTH COUNTY SHOOTING CENTER, INC., A CALIFORNIA CORPORATION; RYAN
PETERSON; GUNFIGHTER TACTICAL, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY;
FIREARMS POLICY COALITION, INC.; SAN DIEGO COUNTY GUN OWNERS PAC; CITIZENS
COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS; SECOND AMENDMENT
FOUNDATION; ROBERT MACOMBER; CLINT FREEMAN,
PLAINTIFFS-APPELLEES,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA;
ALLISON MENDOZA, IN HER OFFICIAL CAPACITY AS DIRECTOR OF DEPARTMENT OF
JUSTICE BUREAU OF FIREARMS,
DEFENDANT-APPELLANT.

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF COLORADO,
CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MARYLAND, MASSACHUSETTS,
MICHIGAN, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, PENNSYLVANIA, AND
RHODE ISLAND AS AMICI CURIAE IN SUPPORT OF APPELLANT**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ARJUN P. OGALE
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE .................................... 1

SUMMARY OF ARGUMENT .................................................................. 5

ARGUMENT ....................................................................................... 6

    I.    States Regulate Handgun Design To Ensure Safety And Traceability ........................................................................... 6

    II.    *Bruen* Does Not Preclude States From Enacting Reasonable Handgun Design Laws ....................................... 14

CONCLUSION .................................................................................. 20

# TABLE OF AUTHORITIES*

*Cases*

*Boland v. Bonta*, --- F. Supp. 3d ---, 2023 WL 2588565 (C.D. Cal. 2023) ...... 10, 17

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................... 5, 14, 15, 16, 18

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2018) .......................................................... 2

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ............ 1

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .................................... 1

*\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ....................................................................... 5, 14, 15, 18

*\*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) ......................... 9, 12, 13, 15, 17, 19

*The Slaughter-House Cases*, 83 U.S. 36 (1873) ...................................................... 1

*Torres v. Lynch*, 578 U.S. 452 (2016) ....................................................................... 3

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ............................ 3, 12, 16

*Statutes and Regulations*

15 U.S.C. § 2052 ....................................................................................................... 3

18 U.S.C. § 923 ....................................................................................................... 11

18 U.S.C. § 925 ......................................................................................................... 3

Ala. Code § 13A-11-64 ........................................................................................... 11

Alaska Stat. § 11-61-200 ......................................................................................... 11

Ariz. Rev. Stat. § 13-3102 ....................................................................................... 11

---

\*     Authorities upon which we chiefly rely are marked with asterisks.

Ark. Code Ann. § 5-73-106 ..................................................... 11

Ark. Code Ann. § 5-73-107 ..................................................... 11

Cal. Health & Safety Code § 113980 ..................................... 2

Cal. Penal Code § 16380 ..................................................... 4, 8

Cal. Penal Code § 16900 ..................................................... 4, 8

Cal. Penal Code § 23900 ......................................................... 11

Cal. Penal Code § 23920 ......................................................... 11

Cal. Penal Code § 29180 ......................................................... 11

Cal. Penal Code § 31900 ........................................................... 7

Cal. Penal Code § 31910 ..................................................... 4, 8

Cal. Penal Code § 32000 ........................................................... 4

Cal. Penal Code § 32015 ..................................................... 4, 8

Colo. Rev. Stat. § 18-12-103 ............................................... 11

Colo. Rev. Stat. § 18-12-104 ............................................... 11

Colo. Rev. Stat. § 25-15-604 ................................................. 2

Conn. Gen. Stat. § 29-36 ..................................................... 11

Conn. Gen. Stat. § 29-36a ................................................... 11

D.C. Code § 7-2505.03 ......................................................... 13

D.C. Code § 7-2505.04 ........................................................... 8

D.C. Code § 22-4512 ............................................................. 11

Del. Code Ann. tit. 11 § 1459 ............................................. 11

Fla. Stat. § 790.27 ................................................................ 11

Ga. Code. Ann. § 16-9-70 ..................................................... 11

Haw. Rev. Stat. § 134-10 ...................................................... 11

Haw. Rev. Stat. § 134-15 ........................................................ 6

Idaho Code § 18-2410 ........................................................... 11

720 Ill. Comp. Stat. § 5/24-5 ................................................ 11

Ind. Code § 35-47-2-18 ........................................................ 11

Kan. Stat. Ann. § 21-6306 .................................................... 11

Ky. Rev. Stat. Ann. § 527.030 .............................................. 11

Ky. Rev. Stat. Ann. § 527.050 .............................................. 11

La. Rev. Stat. § 40:1792 ....................................................... 11

Mass. Gen. Laws ch. 90, § 7H ................................................ 1

Mass. Gen. Laws ch. 140, § 123 ......................................... 6, 7

Mass. Gen. Laws ch. 140, § 131K .......................................... 7

Mass. Gen. Laws ch. 269, § 11C .......................................... 11

940 Mass. Code Regs. § 16.05 ................................................ 8

Md. Code Ann., Pub. Safety § 5-132 ...................................... 7

Md. Code Ann., Pub. Safety § 5-703 ..................................... 11

Me. Stat. tit. 17-A § 705 ...................................................... 11

Mich. Comp. Laws § 750.230 ............................................... 11

Minn. Stat. § 609.667 ........................................................... 11

Minn. Stat. § 624.712 ................................................................ 6

Minn. Stat. § 624.716 ................................................................ 6

Mo. Rev. Stat. § 571.045 ......................................................... 11

Mo. Rev. Stat. § 571.050 ......................................................... 11

Mont. Code Ann. § 45-6-326 .................................................. 11

2016 N. Mar. I. Code § 10310 ............................................... 11

N.C. Gen. Stat. § 14-160.2 ..................................................... 11

N.D. Cent. Code § 62.1-03-05 ................................................ 11

N.H. Rev. Stat. Ann. § 159:13 ............................................... 11

N.J. Rev. Stat. § 2C:39-3 ........................................................ 11

N.J. Rev. Stat. § 2C:39-9 ........................................................ 11

N.J. Rev. Stat. § 2C:58-2.8 ....................................................... 8

N.J. Rev. Stat. § 2C:58-2.10 ..................................................... 8

N.J. Rev. Stat. § 2C:58-2.13 ................................................... 13

N.Y. Penal Law § 265.02 ........................................................ 11

N.Y. Penal Law § 265.10 ........................................................ 11

N.Y. Penal Law § 265.38 ........................................................ 14

N.Y. Comp. Codes R. & Regs. tit. 9, § 482.5 .......................... 6

N.Y. Comp. Codes R. & Regs. tit. 9, § 482.6 .......................... 7

Neb. Rev. Stat. § 28-1207 ...................................................... 11

Neb. Rev. Stat. § 28-1208 ...................................................... 11

Nev. Rev. Stat. § 202.277 .................................................................... 11

Ohio Rev. Code Ann. § 2923.201 .................................................. 11, 12

Okla. Stat. tit. 21 § 1550 ...................................................................... 12

Or. Rev. Stat § 166.450 ........................................................................ 12

18 Pa. Cons. Stat. § 6110.2 .................................................................. 11

18 Pa. Cons. Stat. § 6117 ..................................................................... 12

11 R.I. Gen. Laws § 11-47-24 ......................................................... 11, 12

S.C. Code Ann. § 16-23-30 .................................................................. 11

S.C. Code Ann. § 23-31-180, *repealed by* 2012 S.C. Acts 285 ............... 6

S.D. Codified Laws § 22-14-5 .............................................................. 11

Tex. Health & Safety Code Ann. § 501.001 ........................................... 1

Utah Code Ann. § 76-10-522 ............................................................... 12

Va. Code Ann. § 18.2-311.1 ................................................................. 12

Wash. Rev. Code § 9-41-140 ............................................................... 12

## *Other*

Champe Barton & Tom Jackman, *Popular Handgun Fires Without Anyone
Pulling the Trigger, Victims Say*, Wash. Post (Apr. 11, 2023) ....................... 2, 7

Jeff Brazil & Steve Berry, *Federal Safety Law Targets 15,000 Items, but Not
Guns*, L.A. Times (Feb. 1, 1998) ........................................................... 3

Dep't of Just. et al., *Report to the President Outlining a Strategy To
Expedite Deployment of Gun Safety Technology* (Apr. 2016) ............................ 8

GAO, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms
Could Be Prevented* (Mar. 1991) ............................................................ 2

Erica Goode, *Method To Track Firearm Use Is Stalled by Foes*, N.Y. Times (June 12, 2012) .......................................................................... 12, 13

Barry Meier, *Gun Producers' Use of a Safety Device Is Called Erratic*, N.Y. Times (Mar. 19, 1999) ............................................................ 10

Sara J. Solnick & David Hemenway, *Unintentional Firearm Deaths in the United States 2005-2015*, 6 Inj. Epidemiology (2019) .................................... 2, 9

Brent W. Stricker, *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev. 293 (2000) ........................................................ 3

Derek Thompson, *Six Reasons the Murder Clearance Rate Is at an All-Time Low*, Atlantic (July 7, 2022) .............................................................. 12

Daniel Trotta, *Smart Guns Finally Arriving in U.S., Seeking To Shake up Firearms Market*, Reuters (Jan. 11, 2022) ........................................... 8

Jon S. Vernick et al., *"I Didn't Know The Gun Was Loaded": An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearm Injuries*, 20 J. Pub. Health Pol'y 427 (1999) ................................................. 9, 10

Steven Zeitchik, *Could Smart Guns Save Lives?*, Wash. Post (May 27, 2022) ....... 7

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

The District of Columbia and the states of Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, and Rhode Island file this brief as amici curiae in support of California. California is defending the constitutionality of its consumer-safety and traceability laws requiring certain new semiautomatic pistols to contain chamber load indicators, magazine disconnect mechanisms, and microstamping capabilities before their commercial sale or manufacture in the state. Amici states have a strong interest in ensuring that they can enact and enforce common-sense regulations that, like California's, incentivize the production of safe and traceable handguns.

States bear primary responsibility for protecting the health and safety of the public. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985). Accordingly, states have enjoyed "great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *The Slaughter-House Cases*, 83 U.S. 36, 62 (1873)). The states have long exercised these police powers to protect their citizens from defective and hazardous consumer products. Today, states regulate consumer products as varied as vehicle brake linings, *see* Mass. Gen. Laws ch. 90, § 7H, corrosive or flammable chemicals, *see*

Tex. Health & Safety Code Ann. §§ 501.001-501.026, food products, *see* Cal. Health & Safety Code § 113980, and indoor upholstered furniture, *see* Colo. Rev. Stat. § 25-15-604(3).

This case implicates the states' interest in adopting product-safety regulations for inherently hazardous devices—handguns. Just like other consumer products, handguns with latent defects can cause serious injuries and death. They could, for example, discharge suddenly without a trigger pull. *See* Champe Barton & Tom Jackman, *Popular Handgun Fires Without Anyone Pulling the Trigger, Victims Say*, Wash. Post (Apr. 11, 2023), https://tinyurl.com/ycks3t8e (reporting incidents of unintentional firings of popular SIG Sauer handgun). Or they could lend the false impression of being unloaded while in fact containing a live round. *See* GAO, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented* 17 (Mar. 1991), https://tinyurl.com/bdt75dp8; *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2018) (explaining that chamber load indicators give consumers a "readily perceptible signal that a loaded gun is loaded"). Defective handguns contribute to unintentional discharges, which claim hundreds of American lives annually. *See* Sara J. Solnick & David Hemenway, *Unintentional Firearm Deaths in the United States 2005-2015*, 6 Inj. Epidemiology (2019), https://tinyurl.com/b3frhyz8 (estimating 430 unintentional firearm deaths per year).

State product-safety requirements for handguns carry extra significance because firearms are excluded from the "legion of products" that the federal government regulates. Jeff Brazil & Steve Berry, *Federal Safety Law Targets 15,000 Items, but Not Guns*, L.A. Times (Feb. 1, 1998), https://tinyurl.com/2dmbev4s. Indeed, the federal Consumer Product Safety Act, which applies to a wide swath of consumer products, explicitly exempts firearms and ammunition. 15 U.S.C. § 2052(a)(5)(E).[1] "This freedom from regulation has resulted in the ironic occurrence that children's toy guns are more heavily scrutinized than the real thing." Brent W. Stricker, *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev. 293, 312 (2000). States thus have a special interest in their ability to regulate handgun safety.

Relatedly, the primary responsibility for investigating and enforcing criminal laws, including violent crimes committed with handguns, lies with the states. *See Torres v. Lynch*, 578 U.S. 452, 464 n.9 (2016). In carrying out this function, law enforcement officials rely on firearm serialization and ballistic information to "trace and identify [a firearm's] owner and source." *United States v. Marzzarella*, 614 F.3d 85, 98-100 (3d Cir. 2010). States therefore have a strong interest in encouraging

---

[1] The federal government has modest design requirements for *imported* firearms. *See* 18 U.S.C. § 925(d)(3) (requiring that imported firearms be "particularly suitable for or readily adaptable to sporting purposes"). But these requirements do not apply to domestically manufactured guns.

gunmakers to adopt modern technology that makes it easier to trace handguns used in crimes.

In light of these important interests, California enacted the Unsafe Handgun Act in 1999. The Act requires that new semiautomatic pistol models incorporate certain safety features. If and only if such firearms carry these features, California adds them to its roster of handguns certified for sale in the state. *See* Cal. Penal Code §§ 31910, 32000, 32015. In 2007, California added two required features for new semiautomatic pistols: chamber load indicators, which indicate whether a pistol is loaded, Cal. Penal Code §§ 16380, 31910(b)(4); and magazine disconnect mechanisms, which prevent semiautomatic pistols with detachable magazines from being fired when the magazine is detached, *id.* §§ 16900, 31910(b)(5). In 2013, California added a third required feature: microstamping capability, which imprints a microscopic array of characters onto the cartridge or shell casing of each fired round. *Id.* § 31910(b)(6). Notably, these requirements applied on a prospective basis; semiautomatic pistols already on the roster when the requirements took effect could generally remain on the roster without these features. *Id.* § 31910(b)(4)-(6).

The district court preliminarily enjoined these safety and traceability laws as violating the Second Amendment. This decision undercuts important state interests in product safety and criminal investigation. It restrains states from filling the regulatory void on firearm safety left open by the federal government. It limits the

states' ability to test methods to prevent unintentional firearm injuries.  It overlooks the Supreme Court's instruction that the Second Amendment allows for a "variety" of regulatory measures, including "presumptively lawful" ones like those "imposing conditions and qualifications on the commercial sale of arms."  *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 636 & n.26 (2008).  And it threatens to unravel the limited number of laws that incentivize smart, safe, and traceable handguns.  This Court should reverse.

## SUMMARY OF ARGUMENT

1. States regulate handguns in various ways to ensure their safety and traceability.  Some jurisdictions require gunmakers to undertake quality tests, which evaluate how firearms react upon being dropped or fired.  Other states, like California, endeavor to prevent unintentional shootings by requiring handguns sold at retail to include chamber load indicators and magazine disconnect mechanisms. In a similar vein, states seek to ensure that law enforcement officials can trace handguns used in a crime to their owners.  For example, nearly every state (and the federal government) has laws regulating serial numbers.  And a few jurisdictions incentivize gunmakers to adopt microstamping technology, which identifies a gun used in a crime even if the gun is missing from the crime scene.

2. California's handgun regulations accord with the Supreme Court's decision in *Bruen* and do not violate the Second Amendment.  Neither *Bruen* nor *Heller*

disturb purely commercial regulations like the ones here, which allow full exercise of law-abiding citizens' right to bear arms for self-defense. California's regulations impose no burden on the core Second Amendment right to self-defense given that the gun industry can continue to sell hundreds of alternative handguns to Californian consumers, and those consumers can purchase new semiautomatic pistol models on the private market. The district court's contrary conclusion—that California's laws effectively ban the sale of new semiautomatic pistols—grants gunmakers a free pass to disregard reasonable design-safety laws. This decision jeopardizes reasonable handgun safety and traceability requirements and should be rejected.

## ARGUMENT

### I.    States Regulate Handgun Design To Ensure Safety And Traceability.

1. To serve the important goal of ensuring product safety, states regulate handgun design in several ways. First, states have adopted laws that require handguns to pass certain quality tests before being sold to consumers. Multiple states impose "melting-point" tests, which ban firearms composed of materials with melting temperatures below a certain benchmark (generally between 800 and 1000 degrees Fahrenheit). *See* Haw. Rev. Stat. § 134-15(a); Mass. Gen. Laws ch. 140, § 123, cl. 18(i); Minn. Stat. §§ 624.712(4), 624.716; N.Y. Comp. Codes R. & Regs.

tit. 9, § 482.5.[2]  By requiring the use of high-quality materials, these laws ensure that handguns do not injure users by melting or deforming when fired.

Similarly, California, Massachusetts, and New York impose "drop" tests, which ban firearms that improperly discharge if dropped from a certain height.  *See* Cal. Penal Code § 31900; Mass. Gen. Laws ch. 140, § 123, cl. 19; N.Y. Comp. Codes R. & Regs. tit. 9, § 482.6.  These requirements seek to prevent firearms from malfunctioning and firing when they are accidentally dropped or jostled.  *See* Barton & Jackman, *supra* (providing examples of such mishaps).

Alongside these mandatory quality tests, states are experimenting with ways to encourage the development of "smart guns"—guns that use "biometric data such as fingerprints" and "radio-frequency identification (RFID) transmitted by ring or wristband" to "unlock a gun for its legal owner."  Steven Zeitchik, *Could Smart Guns Save Lives?*, Wash. Post (May 27, 2022), https://tinyurl.com/bdzx4tpe. Maryland, for instance, requires a state agency to annually "review the status of personalized handgun technology" and report its findings to the governor and legislature.  Md. Code Ann., Pub. Safety § 5-132(a)(7), (d).  In Massachusetts, commercially available "mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or

---

[2]     South Carolina used to have a melting-test requirement but repealed it in 2012. *See* S.C. Code Ann. § 23-31-180, *repealed by* 2012 S.C. Acts 285.

authorized user" can satisfy the state's requirement that all firearms include a safety device.  Mass. Gen. Laws ch. 140, § 131K.  And New Jersey tasks a state agency with maintaining a roster of smart guns and requires licensed firearm dealers to "make available for purchase at least one personalized handgun" within 60 days of "the first personalized handgun being included on the [firearm] roster."  N.J. Rev. Stat. §§ 2C:58-2.8, 2C:58-2.10.

These states have recognized that smarter gun technology could prevent accidental shootings, "reduce suicides, render lost or stolen guns useless, and offer safety for police officers and jail guards who fear gun grabs."  Daniel Trotta, *Smart Guns Finally Arriving in U.S., Seeking To Shake up Firearms Market*, Reuters (Jan. 11, 2022), https://tinyurl.com/5fwdk82b; *see also* Dep't of Just. et al., *Report to the President Outlining a Strategy To Expedite Deployment of Gun Safety Technology* 1 (Apr. 2016), https://tinyurl.com/3wh6ws8c (explaining that "these innovations have the potential to reduce accidental and unauthorized firearm discharges, in turn making our country and its citizens safer").  Smart-gun technology remains nascent, but states need the flexibility to add it to their regulatory toolbox once it becomes more widely available.

Building on these design-safety requirements, California and two other jurisdictions—Massachusetts and the District of Columbia—have sought to prevent unintentional shootings by requiring that new models of semiautomatic pistols sold

in their jurisdictions incorporate chamber load indicators and/or magazine disconnect mechanisms. *See* Cal. Penal Code §§ 16380, 16900, 31910(b), 32015; D.C. Code § 7-2505.04 (adopting California's roster of "Handguns Determined Not to be Unsafe"); 940 Mass. Code Regs. § 16.05(3). These requirements tackle features of modern semiautomatic pistols that render them susceptible to inadvertent discharge. Semiautomatic pistols carry ammunition in detachable magazines. But "removing the ammunition from the magazine of a pistol, or removing the magazine entirely from the pistol, may not leave the gun empty" because "one cartridge may remain in the firing chamber ready to be discharged." Jon S. Vernick et al., *"I Didn't Know The Gun Was Loaded": An Examination of Two Safety Devices That Can Reduce the Risk of Unintentional Firearm Injuries*, 20 J. Pub. Health Pol'y 427, 428 (1999). As a result, handgun users face the "common scenario" of wrongly believing that their weapon is unloaded and thus accidentally firing it. Solnick & Hemenway, *supra*.

Chamber load indicators and magazine disconnect mechanisms stymie these incidents. Chamber load indicators communicate to a user "that the gun's firing chamber contains ammunition." Vernick et al., *supra*, at 428. Magazine disconnect mechanisms "automatically" lock a handgun and prevent its firing when the "ammunition magazine is removed," even if one round still sits in the firing chamber. *Id.* In tandem, these "mechanisms help prevent accidental handgun discharges by

decreasing the likelihood that a person will mistakenly believe that the firing chamber is empty." *Pena v. Lindley*, 898 F.3d 969, 988 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part).

Such technology has existed for decades. Prominent gunmakers like Smith & Wesson long ago adopted these inexpensive and easy-to-implement features. *See, e.g.*, Barry Meier, *Gun Producers' Use of a Safety Device Is Called Erratic*, N.Y. Times (Mar. 19, 1999), https://tinyurl.com/2p8wzykv (explaining that "[f]or decades, the nation's biggest gun maker, Smith & Wesson, has incorporated a magazine [disconnect mechanism], a mechanism made of a few springs and a lever that can cost from 9 cents to $2, in virtually *every* semiautomatic pistol it sold to the public" (emphasis added)). One study from 1999 estimated that 14% of new handguns offered for sale the prior year carried magazine disconnect mechanisms. Vernick et al., *supra*, at 433-34. And California's roster of handguns certified for sale today includes 32 semiautomatic pistols that comply with the chamber load indicator and magazine disconnect mechanism requirements. *Boland v. Bonta*, --- F. Supp. 3d ---, 2023 WL 2588565, at *10 (C.D. Cal. 2023).

In short, these two common-sense requirements respond to the danger of inadvertent discharge posed by modern semiautomatic pistols. And, along with quality tests and personalized firearm technology, they constitute a broader trend of state regulation of handgun safety.

2. States, along with the federal government, also regulate firearm design to serve another important goal: investigating crimes. At the federal level, the United States mandates that firearm importers and manufacturers "identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured." 18 U.S.C. § 923(i). Many states complement the federal serialization requirement by either replicating the federal requirement so that it applies to privately-made firearms, *see, e.g.*, Cal. Penal Code § 29180(b); Conn. Gen. Stat. § 29-36a, or preventing firearm users from tampering with preexisting firearm serial numbers. Indeed, an overwhelming majority of jurisdictions regulate serial numbers by prohibiting either the possession of firearms with obliterated serial numbers[3] or the act of obliteration itself.[4] Firearm

---

[3]     Ala. Code § 13A-11-64; Alaska Stat. § 11-61-200; Ariz. Rev. Stat. § 13-3102; Ark. Code Ann. § 5-73-107; Cal. Penal Code § 23920; Colo. Rev. Stat. § 18-12-103; Del. Code Ann. tit. 11 § 1459; Fla. Stat. § 790.27; Ga. Code. Ann. § 16-9-70; 720 Ill. Comp. Stat. § 5/24-5; Ind. Code § 35-47-2-18; Ky. Rev. Stat. Ann. § 527.050; La. Rev. Stat. § 40:1792; Md. Code Ann., Pub. Safety § 5-703(b)(2); Me. Stat. tit. 17-A § 705(1)(E); Minn. Stat. § 609.667; Mo. Rev. Stat. § 571.050; Mont. Code Ann. § 45-6-326; 2016 N. Mar. I. Code § 10310; Neb. Rev. Stat. § 28-1207; Nev. Rev. Stat. § 202.277; N.J. Rev. Stat. § 2C:39-3; N.Y. Penal Law § 265.02; N.C. Gen. Stat. § 14-160.2; Ohio Rev. Code Ann. § 2923.201; 18 Pa. Cons. Stat. § 6110.2; 11 R.I. Gen. Laws § 11-47-24; S.C. Code Ann. § 16-23-30(C); S.D. Codified Laws § 22-14-5.

[4]     Ala. Code § 13A-11-64; Alaska Stat. § 11-61-200; Ariz. Rev. Stat. § 13-3102; Ark. Code Ann. § 5-73-106; Cal. Penal Code § 23900; Colo. Rev. Stat. § 18-12-104; Conn. Gen. Stat. § 29-36; D.C. Code § 22-4512; Fla. Stat. § 790.27; Haw. Rev. Stat. § 134-10; Idaho Code § 18-2410; 720 Ill. Comp. Stat. § 5/24-5; Ind. Code § 35-47-

serialization "enabl[es] the tracing of weapons" recovered from crime scenes "through every transfer from the initial retail sale to the end user," thus allowing law enforcement to identify suspects in criminal investigations. *Marzzarella*, 614 F.3d at 98-100. Such tracing also "provides agencies with vital criminology statistics" and enables "the identification of individual dealers involved in the trafficking of firearms and the matching of ballistics data with recovered firearms." *Id.* at 100.

But law enforcement's ability to solve firearm crimes suffers from a basic challenge—"[i]dentifying the firearm used in a crime." Erica Goode, *Method To Track Firearm Use Is Stalled by Foes*, N.Y. Times (June 12, 2012), https://tinyurl.com/529e354k. Investigators can use serial numbers only upon recovering the actual firearm used to commit a crime, which they can sometimes but not always do. The difficulty of locating crime guns has resulted in severe public safety consequences, including the "'enormous and diverse' problem regarding unsolved homicides committed with handguns." *Pena*, 898 F.3d at 982. In fact, the recent increase in homicides committed with guns has generated an all-time low

---

2-18; Kan. Stat. Ann. § 21-6306; Ky. Rev. Stat. Ann. § 527.030; Mass. Gen. Laws ch. 269, § 11C; Me. Stat. tit. 17-A § 705(1)(E); Mich. Comp. Laws § 750.230; Minn. Stat. § 609.667; Mo. Rev. Stat. § 571.045; Mont. Code Ann. § 45-6-326; 2016 N. Mar. I. Code § 10310; Neb. Rev. Stat. § 28-1208; Nev. Rev. Stat. § 202.277; N.H. Rev. Stat. Ann. § 159:13; N.J. Rev. Stat. § 2C:39-9; N.Y. Penal Law § 265.10; N.C. Gen. Stat. § 14-160.2; N.D. Cent. Code § 62.1-03-05; Ohio Rev. Code Ann. § 2923.201; Okla. Stat. tit. 21 § 1550; Or. Rev. Stat § 166.450; 18 Pa. Cons. Stat. § 6117; 11 R.I. Gen. Laws § 11-47-24; Utah Code Ann. § 76-10-522; Va. Code Ann. § 18.2-311.1; Wash. Rev. Code § 9-41-140.

murder clearance rate of just over 50 percent, as compared to over 90 percent in the 1960s. *See* Derek Thompson, *Six Reasons the Murder Clearance Rate Is at an All-Time Low*, Atlantic (July 7, 2022), https://tinyurl.com/3t6fk5ps.

Microstamping technology offers a potential solution to this problem. This technology, when installed in a semiautomatic pistol, engraves "microscopic arrays of characters that identify the make, model, and serial number of the pistol onto the cartridge or shell casing of each fired round." *Pena*, 898 F.3d at 974. "By reading the code imprinted on casings found at a crime scene, police officers can identify the gun and track it to the purchaser, even when the weapon is not recovered." Goode, *supra*. This Court recently accepted the California legislature's findings that "microstamping technology generally works" and would cost only a modest "$3.00 to $10.00 per gun." *Pena*, 898 F.3d at 983-84.

California thus enacted its microstamping requirement in 2013, and other jurisdictions have begun to encourage microstamping too. In the District of Columbia, semiautomatic pistols manufactured after January 1, 2018, can generally be sold or transferred only if they are "microstamp-ready." D.C. Code § 7-2505.03(b). New Jersey has charged its Attorney General with inspecting microstamping technology and determining the "commercial availability of microstamping-enabled firearms." N.J. Rev. Stat. § 2C:58-2.13. Once the Attorney General certifies such firearms as commercially available, licensed firearm dealers

must "make available for purchase at least one [such] firearm" and "display the firearm in a conspicuous manner that makes it easily visible to customers and distinguishable from traditional firearms." *Id.* § 2C:58-2.13(f)(1). And in New York, once the state certifies that "microstamping-enabled pistols are technologically viable," no firearm dealer can "sell, offer for sale, exchange, give, transfer or deliver any semiautomatic pistol unless such pistol has been verified as a microstamping-enabled pistol." N.Y. Penal Law § 265.38. These microstamping laws add to the mix of state-level handgun design laws that encourage innovation, increase safety, and enable effective criminal investigation.

## II. *Bruen* Does Not Preclude States From Enacting Reasonable Handgun Design Laws.

The Second Amendment allows for a "variety" of gun regulations, such as "laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful regulatory measures." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27, 636 & n.26). Handgun design laws that require manufacturers to prioritize safety and traceability remain valid even after *Bruen*, for at least two reasons. First, the laws generally apply only to those engaged in the commercial sale of guns—not to gun owners. Neither *Bruen* nor *Heller* call such commercial regulations into question. Second, the laws impose no burden on the core Second Amendment right to self-defense. Accordingly, the laws do not

implicate the Second Amendment at all, and this Court need not engage in any historical inquiry.[5]

First, California's laws fall outside the ambit of the Second Amendment because they are "presumptively lawful" commercial regulations. *Heller*, 554 U.S. at 627 n.26. California allows semiautomatic pistols to be commercially sold only if they carry certain design features. Crucially, California does not prohibit the possession or use of semiautomatic pistols that lack these features. *Pena*, 898 F.3d at 977. Subjecting these purely commercial regulations to a historical-analogue test would conflict with the Supreme Court's intention not to "cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27.

Second, California's handgun design requirements do not burden the "central component" of the Second Amendment, which is the "right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 599). Despite the requirements, Californians can continue to purchase "hundreds" of grandfathered handgun models lacking safety features. *Pena*, 898 F.3d at 977. Californians can also buy semiautomatic pistols unavailable at licensed retailers from private sellers

---

[5]    Even if this Court did conduct a historical inquiry, the handgun safety and traceability requirements are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, as California explains in detail, California Br. 31-48.

instead.  *Id.*  This leaves law-abiding citizens with an array of options to exercise their Second Amendment right to armed self-defense.

The district court rejected these two arguments.  Instead, it held that the Second Amendment bars California's laws because they serve as "functional prohibition" on the retail purchase of certain "state-of-the-art" handgun models.  1-ER-020.  The court reasoned that since "no commercially available semiautomatic handguns manufactured in the United States" incorporate the combination of all three requirements of the law, upholding the law would lead to "[s]tates . . . impos[ing] virtually any condition or qualification on the sale of any arm covered by the Second Amendment, no matter how prohibitory."  1-ER-020.

To be sure, a hypothetical firearm-design regulation could prove so impossible for manufacturers to satisfy and so sweeping in its prohibition of existing firearms that it could implicate the Second Amendment.  *See Marzzarella*, 614 F.3d at 92 n.8 ("If there were somehow a categorical exception for [commercial laws], . . . there would be no constitutional defect in prohibiting the commercial sale of firearms.  Such a result would be untenable under *Heller*.").  But that is hardly the case here.  Prospective application of the requirements means that numerous "grandfathered" semiautomatic pistols continue to be available and sold in California.  Besides, the district court overlooked this Court's prior observation (about the microstamping requirement in particular): "[t]he reality is not that

manufacturers cannot meet the standard but rather that they have chosen not to." *Pena*, 898 F.3d at 982; *see also id.* at 983-84 (accepting California's findings that "microstamping technology generally works" and costs only "$3.00 to $10.00 per gun"). This Court should not find a Second Amendment violation based on the gun industry's outright refusal even to attempt to comply with reasonable handgun-design laws.

The district court also erred by treating the chamber load indicator, magazine disconnect mechanism, and microstamping requirements collectively as opposed to analyzing their constitutionality separately. At the very least, California's chamber load indicator and magazine disconnect mechanism requirements should be upheld. *See generally Pena*, 898 F.3d at 988 (Bybee, J., concurring in part and dissenting in part) (concluding that such requirements are constitutional while coming to the opposite conclusion on microstamping). California added several semiautomatic pistols to its roster during the period between when it enacted the chamber load indicator and magazine disconnect mechanism requirements and when it enacted the microstamping requirement. In fact, 32 handguns with the former two features remain on the roster today. *Boland*, 2023 WL 2588565, at *10. This resolves any doubt about whether gunmakers can feasibly incorporate chamber load indicators and magazine disconnect mechanisms in their semiautomatic pistols. The district

court thus should not have concluded that chamber load indicators and magazine disconnect mechanisms stand or fall with microstamping.

Subjecting commercial regulations to the whim of gunmakers has no logical end point and could jeopardize all sorts of design regulations, including basic ones like serialization requirements. For example, gunmakers could refuse to serialize their firearms and then rely on plaintiffs—one step removed from the gunmakers— to bring Second Amendment challenges to serial number laws, arguing that they ban the sale of new guns. This odd result has no support in *Bruen*, which stated that the Second Amendment is not a "regulatory straightjacket." 142 S. Ct. at 2133. Rather, the Constitution allows room for commercial regulations that impose realistic obligations on manufacturers and retailers. *See Heller*, 554 U.S. at 627.

Finally, the district court concluded that the Second Amendment protects the right to "commercially purchase off-roster semiautomatic handguns," including "hundreds of state-of-the-art semiautomatic pistols." 1-ER-14, 20. In its view, California's requirements run afoul of this right. But neither *Bruen* nor *Heller* supports such a novel right. Those decisions instead reiterate that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). This reasoning accords with the Second Amendment's text, which includes

no mention of a right to commercially purchase "state-of-the-art" handguns that fail to incorporate basic safety and traceability features.

At any rate, the district court's peculiar conclusion will not boost access to state-of-the-art handguns—it will inhibit it. The decision prevents states from encouraging gunmakers to adopt cutting-edge safety technology for new firearms. It thus hinders the development of state-of-the-art handguns that could assist law enforcement in solving violent gun crimes and prevent children from accidentally firing a gun (while also allowing law-abiding citizens to defend themselves). As this Court observed, it is "odd" that gunmakers "indirectly assert a right to sell new models of—modern—semiautomatic handguns, but refuse to modernize their firearms" with new, life-saving technology. *Pena*, 898 F.3d at 983. The Second Amendment does not require this Court to endorse that refusal.

# CONCLUSION

This Court should reverse the district court's order.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ARJUN P. OGALE
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
(202) 741-0649 (fax)
caroline.vanzile@dc.gov

May 2023

On behalf of:

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

KWAME RAOUL
*Attorney General*
State of Illinois

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA JOY CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

MATTHEW J. PLATKIN
*Attorney General*
State of New Jersey

LETITIA JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

MICHELLE A. HENRY
*Attorney General*
Commonwealth of Pennsylvania

PETER F. NERONHA
*Attorney General*
State of Rhode Island

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I electronically filed the foregoing amicus brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55367

I am the attorney or self-represented party.

**This brief contains** 4,360 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Caroline S. Van Zile **Date** May 19, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*