# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

LANA RAE RENNA, et al.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Director of the Department of Justice's Bureau of Firearms,

*Defendants-Appellants.*

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:20-cv-02190-DMS-DEB
The Honorable Dana M. Sabraw, Judge

———————————

**APPELLANT'S REPLY BRIEF
(PRELIMINARY INJUNCTION APPEAL –
NINTH CIRCUIT RULE 3-3)**

———————————

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorneys General
GABRIELLE D. BOUTIN
Deputy Attorney General

CHARLES J. SAROSY
Deputy Attorney General
State Bar No. 302439
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6356
  Fax: (916) 731-2119
  Email: Charles.Sarosy@doj.ca.gov
*Attorneys for Defendants-Appellants*

June 30, 2023

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Argument ..................................................................................................... 3

    I.      The District Court Erred in Concluding that Plaintiffs
          Are Likely to Succeed on the Merits of Their Second
          Amendment Challenge to the UHA's Requirements ................ 3

          A.     Plaintiffs Have Failed to Carry Their Burden
                Under the Plain Text Inquiry ......................................... 3

                1.      Plaintiffs' characterization of the plain text
                        inquiry would render it meaningless ................... 4

                2.      The chamber load indicator and magazine
                        disconnect mechanism requirements are
                        feasible handgun safety requirements, not a
                        prohibition on the retail sale of
                        semiautomatic pistols ........................................... 9

                3.      As this Court previously recognized, the
                        microstamping requirement itself is not a
                        prohibition on the retail sale of
                        semiautomatic pistols ......................................... 11

          B.     The Challenged UHA Requirements Are
                 Presumptively Lawful Qualifications on the
                 Commercial Sale of Firearms ...................................... 13

          C.     Firearm Safety and Tracing Requirements Are
                 Consistent with a Historical Tradition of
                 Regulation ...................................................................... 15

                1.      The chamber load indicator and magazine
                        disconnect mechanism requirements are
                        consistent with a historical tradition of
                        regulation .......................................................... 15

# TABLE OF CONTENTS
## (continued)

2. The microstamping requirement is part of a historical tradition of serial number laws designed to control and trace the sale of firearms ................................................................ 21

3. The Roster removal provision is part of a historical tradition of regulating the safety and sales of firearms ........................................... 22

II. The District Court Abused Its Discretion in Evaluating the Equitable Factors .................................................. 24

A. Plaintiffs Failed to Demonstrate Irreparable Harm Because They Do Not Dispute that They Already Possess Semiautomatic Pistols and Have Access to More ............................................................................ 24

B. The Balance of Equities Weighs Against a Preliminary Injunction .................................................. 26

Conclusion ........................................................................................ 29

Certificate of Compliance ............................................................... 30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adames v. Sheahan*
    909 N.E.2d 742 (Ill. 2009) ........................................................ 26

*Boland v. Bonta*
    No. 23-55276 (9th Cir. June 2, 2023) ............................... 9, 10, 18, 25, 27

*Boland v. Bonta*
    No. 8:22-cv-01421-CJS-ADS (C.D. Cal.) ............................................. 10

*Gay v. Parsons*
    61 F.4th 1088 (9th Cir. 2023) ...................................................... 13

*Caribbean Marine Servs. Co., Inc. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ...................................................... 24

*Def. Distributed v. Bonta*
    No. CV 22-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21,
    2022) ............................................................................. 7

*Dist. of Columbia v. Heller*
    554 U.S. 570, 626 (2008) ................................................ 5, 6, 13, 14, 19

*Doe v. Snyder*
    28 F.4th 103 (9th Cir. 2022) ...................................................... 26

*Hartford v. Ferguson*
    No. 3:23-cv-05364-RJB, 2023 WL 3836230 (W.D. Wash.
    June 6, 2023) ..................................................................... 17

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ...................................................... 19

*McDonald v. City of Chicago, Ill.*
   561 U.S. 742 (2010)...................................................................... 13

*New York State Rifle & Pistol Association, Inc. v. Bruen*
   142 S. Ct. 2111 (2022).......................................................... *passim*

*Oakland Tactical Supply, LLC v. Howell Twp.*
   No. 18-cv-13443, 2023 WL 2074298 (E.D. Mich. Feb. 17,
   2023) ................................................................................... 3, 7

*Pena v. Lindley*
   898 F.3d 969 (9th Cir. 2018) ............................................... *passim*

*Teixeira v. Cnty. of Alameda*
   873 F.3d 670 (9th Cir. 2017) (en banc) ............................... 6, 22

*United States v. Alaniz*
   __ F.4th __, No. 22-31041, 2023 WL 3961124 (9th Cir. June
   13, 2023) .............................................................................. 5, 21

*United States v. Holton*
   2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ................................ 21, 23

*United States v. Reyna*
   No. 3:21-CR-41, 2022 WL 17714376 (N.D. Ind. Dec. 15,
   2022) ................................................................................... 4, 5

*Winter v. Natural Resources Defense Council, Inc.*
   555 U.S. 7 (2008)................................................................. 2, 3

**TABLE OF AUTHORITIES**
**(continued)**

Page

**STATUTES**

Cal. Penal Code
    § 16380 ............................................................................... 16
    § 16900 ............................................................................... 16
    § 31910 ..................................................................... 11, 12, 28
    § 32000 ............................................................................... 27
    § 32010 ............................................................................... 25
    § 32015 ............................................................................... 25
    § 32030 ............................................................................... 25

**CONSTITUTIONAL PROVISIONS**

Second Amendment ............................................................. *passim*

Fourteenth Amendment ............................................................ 16

**OTHER AUTHORITIES**

S.B. 452, 2023–2024 Reg. Session (Cal. 2023) ........................................... 12

v

# INTRODUCTION

California's Unsafe Handgun Act ("UHA") imposes feasible public safety requirements before certain semiautomatic pistols may be sold at a firearms dealer in the State. The UHA is constitutional under the text-and-history standard set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022): the requirements do not interfere with any right protected by the plain text of the Second Amendment and are consistent with a historical tradition of firearms and ammunition laws aimed at ensuring public safety. Thus, Plaintiffs cannot demonstrate the likelihood of success necessary for a preliminary injunction. And, at a minimum, equitable considerations weigh heavily against an injunction. Because the individual Plaintiffs have not disputed they own or may acquire firearms, they have adequate means to defend themselves while the district court considers the constitutional issues presented in this case.

Plaintiffs' approach assumes that the Second Amendment protects any firearms that manufacturers deem feasible or popular, even if those firearms lack any safety features. But that is not what the text-and-history standard requires. With respect to the textual analysis, it is Plaintiffs' burden to establish that the Second Amendment's plain text covers their proposed course of conduct. But Plaintiffs assert that they meet this burden simply because the items at issue in this case are bearable arms. This approach renders the textual analysis meaningless.

They also contend that the UHA's requirements functionally ban certain semiautomatic pistols because the requirements are technologically infeasible, but Plaintiffs identify no record evidence supporting their argument. Instead, it is clear that manufacturers can comply—indeed, have complied—with the chamber load indicator and magazine disconnect mechanism requirements, and that manufacturers have simply refused to comply with the microstamping requirement. Plaintiffs' assumption that the UHA operates as a ban on certain firearms is unfounded.

Concerning the historical analysis, Plaintiffs continue to demand a "historical twin," contrary to *Bruen*. Properly analyzed, however, the challenged public safety requirements are consistent with a historical tradition of regulations aimed at reducing the harm from firearms when they do not operate as intended, and tracing firearms used in crimes. The Roster removal provision, which would assure that the pool of commercially available arms becomes proportionally safer over time, is consistent with the same historical tradition, as well as with the tradition of regulations controlling firearms commerce.

As to the equitable factors that Plaintiffs must establish under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), Plaintiffs identify no immediate and practical harm they would suffer absent the injunction. They do not dispute they already possess semiautomatic pistols and can access hundreds

more. *Winter* demands some additional showing of harm, especially in circumstances where a preliminary injunction would upset a consumer safety regime that has been in place for a decade or more. Under both *Winter* and *Bruen*, the district court abused its discretion, and this Court should reverse the order granting the preliminary injunction.

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE TO THE UHA'S REQUIREMENTS**

A. **Plaintiffs Have Failed to Carry Their Burden Under the Plain Text Inquiry**

Plaintiffs have the burden of establishing that the "plain text of the Second Amendment protects [the individual's] proposed course of conduct," *Bruen*, 142 S. Ct. at 2134—*i.e.*, whether the regulation at issue prevents "the people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II. Defendant's Opening Br. (OB) 20–21. If Plaintiffs establish this, "the Constitution presumptively protects" the proposed course of conduct, and only then does the burden shift to the government for the historical inquiry. *Bruen*, 142 S. Ct. at 2130; *see also Oakland Tactical Supply, LLC v. Howell Twp.*, No. 18-cv-13443, 2023 WL 2074298, at *3, n.4 (E.D. Mich. Feb. 17, 2023), *appeal docketed*, No. 23-1179 (6th Cir. Mar. 1, 2023) (defining the proposed conduct simply as "training with firearms" would lead to the "absurd result" that in future constitutional

challenges "any proposed conduct touching on any type of firearms training would be presumptively protected by the plain text of the Second Amendment"); *United States v. Reyna*, No. 3:21-CR-41, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) (if the proposed conduct was "mere possession" in a challenge to the federal prohibition of possessing a firearm with an obliterated serial number, then other challenged regulations implicating possession would "promptly and automatically proceed to" the historical inquiry). Plaintiffs fail to carry this burden, because they assert that they only need demonstrate that a firearm is at issue in this case, and that any requirement on the sale of a firearm is a prohibition on the sale of firearms. Neither of these assumptions is consistent with *Bruen*.

### 1. Plaintiffs' characterization of the plain text inquiry would render it meaningless

Plaintiffs attempt to reframe the plain text inquiry so as to render it meaningless. *See* Plaintiffs' Answering Br. (AB) 21 (describing it as a "simple test that operates at a high level of generality"). They assert they meet their burden because "the handguns at issue in this case indisputably are bearable arms," (AB 22), and "any bearable arm falls within the Amendment's ambit." AB 26. But this approach would mean that any regulation having any effect on firearms possession or use could be presumptively protected by the Second Amendment's plain text. For example, under Plaintiffs' approach, generally applicable zoning laws prohibiting retail sales in residential neighborhoods (including those of firearms)

could satisfy the plain text inquiry and then be subject to historical scrutiny; so, too, a standard sales tax that impacts an individual's ability to purchase a handgun; or a law that requires all retailers to retain records of commercial sales. Although Plaintiffs contend the State "completely fails to engage" with the plain text inquiry (AB 23) by advancing a vigorous inquiry, it is Plaintiffs' approach that seeks to evade *Bruen*'s requirements. AB 23, n.4 (claiming that "[w]e need not argue about how specific the articulation [of proposed conduct] must be"). Plaintiffs' approach is not the plain text inquiry that *Bruen* envisioned when it reiterated that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *Reyna*, 2022 WL 17714376, at *4 ("This limitation comes from the text of the Second Amendment.").

This is made even more evident by Plaintiffs' argument that "at the plain text level the only question is whether the item in question is an 'arm.'" AB 23, n.4. But that question is only part of the textual inquiry, which also asks "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, __ F.4th __, No. 22-31041, 2023 WL 3961124 at *3 (9th Cir. June 13, 2023) (quoting *Bruen*, 142 S. Ct. at 2134–35). Under Plaintiffs' limited view of the plain text inquiry, the Second Amendment would include the right to purchase a semiautomatic pistol that could inadvertently fire without the user pulling the

trigger (because it did not have to pass a drop-safety test), or that could explode in the user's hand (because it did not have to pass a firing test), or that could be structurally weakened when fired (because it did not have to pass a melting-point test). According to Plaintiffs, the "desire" to purchase any "bearable arm," (AB 11, 22), regardless of its lack of safety measures, would reflect conduct that is presumptively protected by the Second Amendment. But this Court has observed, with an analysis rooted in *Heller*, that there is no "constitutional right to purchase a particular handgun" (*Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018)), and that "the Second Amendment does not elevate convenience and preference over all other considerations." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc).

Plaintiffs additionally assert that the challenged regulation should not be considered in the plain text inquiry because "any limitations" on the scope of the Second Amendment right "are a matter of history, not plain text." AB 22. But the challenged regulation naturally informs the scope of the proposed conduct. Specifically defining the proposed conduct necessarily requires consideration of what the challenged regulation actually restricts or prohibits. Otherwise, the Supreme Court's use of the qualifier "proposed" before "course of conduct" when describing the plain text analysis would be meaningless. *See Bruen*, 142 S. Ct. at 2134.

6

Ignoring the challenged regulation in the plain text inquiry would contradict *Bruen*. Contrary to Plaintiffs' contention, the course of conduct in *Bruen*—"carrying handguns publicly for self-defense," 142 S. Ct. at 2134—was not defined at "a high level of generality." AB 21. *See also Oakland Tactical Supply*, 2023 WL 2074298, at *3 ("The proposed conduct could not be simply 'training with firearms' because the zoning ordinance does not prohibit 'training with firearms.'"); *Def. Distributed v. Bonta*, No. CV 22-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022), *adopted at* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) (the proposed conduct was the self-manufacture of firearms based on the plaintiffs' characterization of the challenged statutes as a ban on such conduct). Moreover, *Bruen* endorsed "shall-issue" public-carry licensing regimes that required "applicants to undergo a background check or pass a firearms safety course," among other things. 142 S. Ct. at 2138, n.9; *see also id.* at 2162 (Kavanaugh, J., concurring) (noting that fingerprinting, a mental health records check, and training in firearms handling were additional "constitutionally permissible" requirements). The Supreme Court cited no historical analogues for these constitutionally permissible requirements, and it would be illogical for the Supreme Court to approve of these shall-issue regime licensing requirements without a historical analysis if, as Plaintiffs claim, it is only the historical inquiry

7

that addresses any limits on the scope of the right. AB 22; *see also* Everytown for Gun Safety Amicus Br. ("EAmB") 8–9, C.A. Dkt. 24.

Just as these commonsense public safety requirements were determined to be constitutionally permissible without the need for a historical analysis in *Bruen*, the same is true for the challenged requirements here, which do not prohibit the possession of handguns. Instead, the challenged provisions require that a new semiautomatic pistol have commonsense public safety features before it can be added to the Roster of Certified Handguns (the "Roster"), and thus be available for retail sale in the State. OB 7–10.

The UHA requirements do not interfere with what the district court described as "state-of-the-art semiautomatic pistols." 1-ER-20. Putting aside that neither the district court nor Plaintiffs define what constitutes a "state-of-the-art semiautomatic pistol," it is unclear why such a "state-of-the-art" pistol would not have commonsense public safety features that can prevent accidental shootings and help solve shooting crimes.[1] OB 22–30. Plaintiffs do not meaningfully address this question and instead assert they have a presumptive right to purchase

---

[1] Plaintiffs assert that these supposed "state-of-the-art" semiautomatic pistols have "improvements in design, safety, reliability, and ergonomics," compared to those on the Roster. AB 10 (citing 2-ER-281–82). But the evidence relied upon for this assertion is conclusory and lacking in detail, simply stating that certain off-Roster semiautomatic pistols are "more reliable and [have] better ergonomics." *See, e.g.*, 2-ER-281.

whichever handguns they desire, so long as it is a "bearable arm" that is in "common use." AB 22. But that approach outsources safety requirements to firearms manufacturers by allowing them to define the market; nothing in the Second Amendment requires States to stand back and allow firearms manufacturers to dictate what the Second Amendment protects. *See* AB 10.

### 2. The chamber load indicator and magazine disconnect mechanism requirements are feasible handgun safety requirements, not a prohibition on the retail sale of semiautomatic pistols

Plaintiffs and the district court consider the requirement for a chamber load indicator and magazine disconnect mechanism to be a "ban [on] the retail sale of modern handguns." AB 18. Plaintiffs contend that the plain text inquiry is easily satisfied because the UHA restricts the purchase of the arms they desire. AB 21–23. But the assumption that these two safety requirements have barred the sale of semiautomatic pistols relies on the mistaken premise that chamber load indicators and magazine disconnect mechanisms are not feasible to implement on the very arms they seek to purchase. OB 27–28.

The district court acknowledged that manufacturers have demonstrated that they can make semiautomatic pistols satisfying these two safety requirements, and never found that manufacturers could not comply with them. 1-ER-12. Plaintiffs do not assert as much either, nor could they, because the "trade association of the firearms industry" admits these features "are capable of implementation." *Boland*

*v. Bonta*, No. 23-55276 (9th Cir. June 2, 2023), National Shooting Sports Foundation, Inc. Amicus Br. 1, 20, C.A. Dkt. 54.  Contrary to Plaintiffs' claim that "virtually no handgun in America" has a chamber load indicator and magazine disconnect mechanism (AB 1), when these requirements were enacted in 2003, "between eleven and fourteen percent of handguns in the United States were available with a [chamber load indicator] and [magazine disconnect mechanism]." *Pena*, 898 F.3d at 974, n.4; *see also* Brady Center to Prevent Gun Violence Amicus Br. ("BAmB") 31, C.A. Dkt. 18 (citing expert testimony from a 2009 case that over 300 handgun models have a magazine disconnect mechanism).  Five manufacturers added a total of 34 semiautomatic pistols to the Roster with these two safety features after they were required in 2007, and 32 such pistols from four manufacturers remain on the Roster today.  *Boland v. Bonta*, No. 23-55276 (9th Cir. Apr. 28, 2023), Excerpts of Record ("*Boland* EOR"), Vol. 2 at 211–13.[2]

Firearms manufacturers' capacity to meet these requirements has not changed.  In the short time since the preliminary injunction of the microstamping requirement in *Boland v. Bonta*, No. 8:22-cv-01421-CJS-ADS (C.D. Cal.) took effect on April 3, 2023 (*see Boland v. Bonta*, No. 23-55276 (9th Cir. Mar. 31,

---

[2] Additionally, the United States' military has for decades used semiautomatic pistols with a chamber load indicator from two manufacturers, and other law enforcement agencies have used pistols with a magazine disconnect mechanism.  BAmB 27–30.

2023), Order, C.A. Dkt. 7), three rimfire semiautomatic pistols with a magazine disconnect mechanism from one manufacturer have become available for retail sale in the State,[3] and a centerfire semiautomatic pistol with a chamber load indicator and magazine disconnect mechanism will be available as well once the manufacturer pays the minimal fee required. *Handguns Certified for Sale*, Office of the Cal. Att'y Gen. (June 30, 2023, 9:48 AM), https://oag.ca.gov/firearms/certified-handguns/search?make=151002 (listing the Sturm, Ruger & Co.'s LCP II 13747, MARK IV-40183, and SR22P-03657). These safety features are thus undeniably feasible to implement in the semiautomatic pistols that Plaintiffs wish to purchase, and manufacturers appear ready to continue to do so. Characterizing these two features as a "functional prohibition" is inconsistent with reality. 1-ER-20.

> ### 3. As this Court previously recognized, the microstamping requirement itself is not a prohibition on the retail sale of semiautomatic pistols

To support their argument that the microstamping requirement also operates as a ban on the sale of certain semiautomatic pistols (thus implicating the plain text of the Second Amendment), Plaintiffs emphasize that a new semiautomatic pistol has not been added to the Roster since the requirement took effect in May 2013.

---

[3] Unlike the magazine disconnect mechanism requirement, the chamber load indicator requirement applies only to centerfire, but not rimfire, semiautomatic pistols. Cal. Penal Code § 31910(b)(4), (b)(5); 1-ER-6.

AB 7-8.  But also like the district court, Plaintiffs fail to reconcile their reasoning

with this Court's explanation for the cause: firearm manufacturers' refusal to

comply with the requirement.  *Pena*, 898 F.3d at 982 ("The reality is not that

manufacturers cannot meet the standard but rather that they have chosen not to.");

*see also* OB 28–30.[4]  Plaintiffs' only response to this is that "this argument is

incoherent."  AB 27.  Yet, they point to nothing to contradict this Court's prior

determination that microstamping was publicly tested by police departments, "the

legislature considered studies showing that microstamping technology generally

works," and "compliance with the microstamping requirement is 'technologically

possible' and would cost an incremental $3.00 to $10.00 per gun."  *Pena*, 898 F.3d

at 983–84.  Plaintiffs' claims of infeasibility cannot be taken at face value because

they are as conclusory and lacking in detail as they were when this Court addressed

the claims five years ago.  *Id.*  Contrary to Plaintiffs' assertions otherwise (AB 28),

this Court's previous rejection of the argument that "microstamping is

---

[4] The Legislature is currently considering Senate Bill 452 ("SB 452"), which would remove the microstamping requirement from the UHA (including the Roster removal provision), move it to a different division of the Penal Code, and delay the effectiveness of the requirement until July 1, 2027.  S.B. 452, 2023–2024 Reg. Session (Cal. 2023) (removing subdivision (b)(6) from California Penal Code section 31910).  The bill has passed the state Senate and is pending in the Assembly, as of the date of this brief.  *SB-452 Firearms (2023-2024)*, Cal. Legis. Info. (June 30, 2023, 9:50 AM), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240SB 452.

impracticable" (*id.* at 982)—the same argument Plaintiffs make here—remains valid after *Bruen* because this Court's evaluation of feasibility evidence in *Pena* is not "clearly irreconcilable" with *Bruen*. *Gay v. Parsons*, 61 F.4th 1088, 1094 (9th Cir. 2023); *see also* EAmB 6, n.4.

To accept Plaintiffs' infeasibility argument now would allow firearm manufacturers to cherry pick which public safety feature requirements they will adopt, claim infeasibility on the others, and in effect dictate what is covered by the plain text of the Second Amendment, such that any challenges to the safety requirements they choose not to comply with will proceed to the historical inquiry. That is not the plain text analysis set forth in *Bruen*.

## B.   The Challenged UHA Requirements Are Presumptively Lawful Qualifications on the Commercial Sale of Firearms

The challenged public safety feature requirements also fall into the presumptively lawful category of "laws imposing conditions and qualifications on the commercial sale of arms." *See Heller*, 554 U.S. at 626–27; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 787 (2010); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); OB 31–34. Plaintiffs raise two arguments in response. Neither is correct.

They first assert that *Bruen* did not endorse any presumptively lawful categories of laws. AB 29–32. But this not only overlooks contrary statements in *Heller* and *McDonald*, it also ignores Justice Kavanaugh's concurring opinion in

*Bruen*—which Chief Justice Roberts joined—repeating from *Heller* the language that "the Second Amendment allows for a 'variety' of gun regulations," and quoting verbatim from *Heller* the list of presumptively lawful categories of laws. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

Next, Plaintiffs again insist that the three challenged requirements cannot be presumptively lawful qualifications on commercial sales, because they serve as "a 'functional prohibition' on the sale of arms." AB 31. As explained above, the challenged requirements do not operate as an outright prohibition on any arms. They require only that new semiautomatic pistols available for retail sale include certain public safety features, and manufacturers have demonstrated they can and will meet the chamber load indicator and magazine disconnect mechanism requirements. The challenged requirements also do not prohibit possession of semiautomatic pistols, nor do the requirements apply to private transactions between individual firearm owners. OB 33–34.

### C. Firearm Safety and Tracing Requirements Are Consistent with a Historical Tradition of Regulation

Even if the Court proceeds to the historical inquiry, the challenged UHA requirements are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; OB 34–48.[5]

As demonstrated in the Opening Brief, the technological advances behind these requirements trigger *Bruen*'s "more nuanced" historical inquiry (OB 35–36), under which there are "at least two metrics" to determining whether regulations are relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33. Plaintiffs do not appear to dispute this. AB 34.

#### 1. The chamber load indicator and magazine disconnect mechanism requirements are consistent with a historical tradition of regulation

Firearm and gunpowder inspection and storage laws dating to the founding era demonstrate that the chamber load indicator and magazine disconnect mechanism requirements are consistent with this Nation's history of protecting consumers from the inherent dangers of firearms and ammunition. OB 36–43.

---

[5] Plaintiffs mistakenly contend that Defendants are precluded from relying on any historical analogues because the challenged requirements ban "[h]andguns in common use." AB 33; *see also* AB 19, 26. As previously explained (*supra*, pp. 2, 11, 14; OB 27–30, 33–34), the challenged requirements do not constitute a ban. And, Plaintiffs' position contradicts the burden-shifting framework in *Bruen*, 142 S. Ct. at 2130.

Plaintiffs disagree and, like the district court, effectively demand a "historical twin" to satisfy *Bruen*. AB 35–41. But of course, there can be no historical twin for regulations meant to mitigate specific dangers in semiautomatic pistols, which did not even exist at the founding era or at the adoption of the Fourteenth Amendment.

Plaintiffs first contend that the inspection laws and the chamber load indicator and magazine disconnect mechanism requirements are not relevantly similar because the former ensured the regulated items "operated as intended" whereas the latter "force[s] gun manufacturers to add unusual 'safety' features." AB 35, 38. That is a distinction without a difference here. Both the historical laws and challenged requirements seek to reduce the dangers of a firearm or ammunition that does not function or is not used as intended. OB 36–43. The historical laws did so by mandating inspections of the regulated items to ensure the firearm or ammunition did not unexpectedly fire. OB 36–38. Similarly, the chamber load indicator and magazine disconnect mechanism ensure "that handguns properly function" (AB 36) by working together to prevent a pistol from unintentionally firing when the consumer mistakenly believes the pistol is unloaded. The chamber load indicator "plainly indicates" the pistol is loaded (Cal. Penal Code § 16380), and if that notice fails to stop the user from pulling the trigger when a magazine is not inserted, then the magazine disconnect mechanism prevents the pistol from

firing the cartridge that might remain in the chamber (Cal. Penal Code § 16900).

OB 41–42.  Plaintiffs miss the point when they state that a handgun without these

features will "function just fine."[6]  AB 36.  A firearm that fires when the user

believes it is unloaded is not one that operates as a consumer expects it to.

Plaintiffs misread *Bruen* in demanding a historical analogue that "prescribe[d]

any particular features or specifications for firearms to be sold in the state."  AB

35.  That is akin to demanding a "historical twin."  *Bruen*, 142 S. Ct. at 2133; *see

also Hartford v. Ferguson*, No. 3:23-cv-05364-RJB, 2023 WL 3836230, at *6

(W.D. Wash. June 6, 2023) ("*Bruen* does not require that the historical regulation

be the exact same.").  It also elevates the firearms manufacturers' views about what

safety features to include in a firearm over the views of legislatures and regulators,

and allows the manufacturers to dictate the scope of the Second Amendment.  That

cannot be what the Supreme Court envisioned when it explained that a "modern-

day regulation [need] not [be] a dead ringer for historical precursors," but rather

need only be "analogous enough to pass constitutional muster."  *Bruen*, 142 S. Ct.

at 2133.

In any event, the firearm and ammunition inspection laws did indeed

prescribe "particular features" before those items were sold: the muskets and

---

[6] The record does not support Plaintiffs' assertion that off-Roster
semiautomatic pistols "almost certainly function better than" those on the Roster.
AB 36.

pistols could not fail and had to fire a specified distance using a certain amount of

gunpowder, while the gunpowder had to meet certain quality standards.  OB 37–

38; *see also* 2-ER-258–59 (text of the 1804 Massachusetts firearm inspection law);

*Boland* EOR, Vol. 7 at 1350–51 (text of the 1814 update to the same law).[7]

The fact that historical laws did not require additional "features," especially

ones that could not be contemplated given the muzzle-loading nature of firearms at

the time of the founding (2-ER-204–06), does not thereby preclude States from

requiring that semiautomatic handguns have certain safety features now.  OB 42.

Otherwise, it is difficult to foresee how other requirements, such as melting-point

tests and drop-safety tests, could pass constitutional muster.  *See* District of

Columbia, et al. Amicus Br. ("DCAmB") 6–9, C.A. Dkt. 21.  Such a result would

render the Second Amendment a "regulatory straightjacket."  *Bruen*, 142 S. Ct. at

2133.

Plaintiffs also contend that the historical laws did not impose comparable

burdens to the challenged UHA requirements, but in doing so they overstate the

burdens imposed by the chamber load indicator and magazine disconnect

---

[7] The text of Maine's 1821 firearm inspection law, which is similar to that of
Massachusetts' laws, can be found at the Duke Center for Firearms Law's
Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/laws-of-the-
state-of-maine-to-which-are-prefixed-the-constitution-of-the-u-states-and-of-said-
state-in-two-volumes-with-an-appendix-page-685-686-image-272-273-vol-2-1821-
available-at-the-maki/.

requirements.  AB 35–39.  These requirements do not "ban[] an entire class of handguns that work as intended" (AB 39) any more than the firing and drop-safety tests do.  Indeed, this Court previously concluded that the chamber load indicator and magazine disconnect requirements "place almost no burden on the physical exercise of Second Amendment rights."  *Pena*, 898 F.3d at 978.  That conclusion remains sound.  *See* EAmB 6, n.4.  The firearm and ammunition inspection laws are thus "relevantly similar" under *Bruen*.[8]

Plaintiffs further err in contending that Defendant's historical analogues are not sufficiently "well-established and representative" under *Bruen*.  AB 37–38.  By arguing that "*Bruen* demands more" than the historical laws identified by Defendants, Plaintiffs imply there must be some particular quorum of jurisdictions that adopted laws in order to reflect a historical tradition of regulation.  AB 38.  But *Bruen* imposed no such numerical requirement, and imposing such a rule would be particularly unwarranted when there is no "overwhelming" contrary

_____

[8] Plaintiffs' attempts to minimize the relevance of the firearm and gunpowder storage historical laws fare no better for the same reasons.  *Compare* AB 37–41 *with* OB 38–43.  Plaintiffs acknowledge that the storage laws, like the chamber load indicator and magazine disconnect requirements, share the same justification of preventing injury from unintended or premature ignition of a firearm or ammunition.  AB 39–40.  As to the Massachusetts law that prohibited the storage of a loaded firearm in Boston (2-ER-213), Plaintiffs wrongly contend that it cannot be considered a historical analogue here, when there is no contradictory evidence relevant to the challenged requirements (which are not a handgun ban).  AB 37–38 (citing *Heller*, 554 U.S. at 631–32; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014)).

evidence—let alone any evidence—of a right to purchase a specific model of a handgun without safety features.  *See* 142 S. Ct. at 2133, 2155; *see also* EAmB 25, n.14.

Plaintiffs' numerical arguments also exclude directly relevant examples.  For example, Plaintiffs assess only which States adopted *firearm* inspection laws, and isolate those States from the additional jurisdictions that adopted ammunition inspection laws and/or firearm and gunpowder storage laws.  *Compare* AB 37–38 *with* OB 37–39.  Even when looking only at the inspection laws, six states adopted them (OB 37), exceeding Plaintiffs' implied metric of a "few states."  AB 38.  Plaintiffs additionally minimize the significance of Massachusetts laws because they did not apply to the federal Springfield Armory located in Massachusetts.  AB 36.  But this ignores the fact that the armory's arms "were nonetheless subjected to thorough testing and were stamped as well."  2-ER-208.  The armory also "served as an incubator for other local producers and gunsmiths," and "served as a spur to technological innovation in the region," so much so that western Massachusetts became a leading producer of small arms by 1810.  2-ER-207.  By excluding or discounting these types of probative examples, Plaintiffs misinterpret the historical evidence of a historical tradition of imposing practicable and feasible safety requirements to protect the public from firearms that do not function as intended.

## 2. The microstamping requirement is part of a historical tradition of serial number laws designed to control and trace the sale of firearms

Historical analogues supporting the federal serial number requirements are sufficient to support the microstamping requirement because this Court has held that "microstamping is an extension of identification methods long used in imprinting serial numbers on guns." *Pena*, 898 F.3d at 985. Plaintiffs' three bases for resisting these analogues all fail.

First, contrary to Plaintiffs' contention (AB 41), this Court can consider the analogues for the first time on appeal. *Alaniz*, 2023 WL 3961124 at *4, n.1 ("[The law's challenger] contends that the government's analogues cannot be considered on appeal because they were not raised below. But that is not so."). Next, Plaintiffs complain that Defendants have failed to identify "specific historical regulations." AB 42. But even assuming that were necessary—*Bruen* does not require it—Defendants have explained that such specific regulations have been identified by at least one district court, *see United States v. Holton*, 2022 WL 16701935, at *4–5 (N.D. Tex. Nov. 3, 2022), and in the sources relied upon by that court. OB 44–45. Finally, Plaintiffs assert that the microstamping requirement imposes a more substantial burden than serial number requirements. AB 42. But as this Court previously recognized, any burden from the requirement arises from

firearms manufacturers' reluctance to comply with it, not the requirement itself.

OB 45; *see Pena*, 898 F.3d at 982–83.[9]

### 3. The Roster removal provision is part of a historical tradition of regulating the safety and sales of firearms

As to the Roster removal provision, Plaintiffs fail to engage with the historical analogues showing a history of regulating the commercial sale of firearms.[10] OB 46–48. Instead, Plaintiffs wrongly assert that "no specific historical analogues" were cited. AB 43. But in addition to citing laws from New Hampshire and New York City, Defendants identified authorities discussing specific analogues and showing that the American colonies "substantially controlled the firearms trade" by "provid[ing] and stor[ing] guns, control[ling] the conditions of trade, and financially support[ing] private firearm manufacturers." OB 47 (quoting *Teixeira*, 873 F.3d at 685). For example, this Court previously discussed a Connecticut law that "banned the sale of firearms by its residents outside the colony," (*id.*), and a Virginia law that allowed for the sale of firearms and ammunition to only "his majesties loyal[] subjects inhabiting this colony." *Id.* at 685, n.18. This Court also

---

[9] Plaintiffs point to no evidence that microstamping could not be "commercially available" if manufacturers had decided to comply with the requirement. AB 42.

[10] The district court enjoined the Roster removal provision because it found that the provision could not be severed from the three other enjoined UHA requirements. 1-ER-27. Consequently, there was no historical analysis of the Roster removal provision.

discussed other colonial laws that constituted "restrictions on the commercial sale of firearms." *Id.* at 685. In addition to citing the historical laws themselves, this Court cited secondary sources that either cited additional historical laws or discussed the laws in more detail. *Id.*; *see also Holton*, 2022 WL 16701935, at *5 (same).

Far from "generalizing" the analysis, (AB 43), the laws discussed above demonstrate a history of States enacting controls on firearms commerce under the justification of public safety. The burdens imposed by these laws included prohibiting where and to whom residents could sell firearms, and prohibited specified groups from purchasing firearms. The Roster removal provision imposes no such burden. Instead, the provision increases the proportion of semiautomatic pistols with the three public safety features that are available for retail sale while still allowing ready access to numerous handguns on the Roster. This comparison of the "how and why the regulations burden a law-abiding citizen's right to armed self-defense" is exactly what *Bruen* calls for (142 S. Ct. at 2133), rather than the interest-balancing test that Plaintiffs perceive. AB 44.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN EVALUATING THE EQUITABLE FACTORS

### A. Plaintiffs Failed to Demonstrate Irreparable Harm Because They Do Not Dispute that They Already Possess Semiautomatic Pistols and Have Access to More

Plaintiffs do not explain how they sufficiently "demonstrate[d] immediate threatened injury," *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), particularly when they continue to not dispute that the Individual Plaintiffs own or may acquire handguns.[11] OB 53, 56; AB 47–50. They identify no practical harms, and instead maintain that an alleged constitutional violation is sufficient. AB 46–47. But as explained in the Opening Brief, even the cases relied upon by the district court and Plaintiffs for this proposition—which are not Second Amendment cases—do not actually stand for this principle. OB 54–56.

Plaintiffs did not, and cannot, identify any immediate harm that is remotely similar to the harm identified in those cases. Instead, Plaintiffs appear to "admit that they are able to buy an operable handgun suitable for self-defense—just not the exact gun they want." *Pena*, 898 F.3d at 978. But Plaintiffs' undefined "loss of 'peace of mind'" (AB 48) is not a concrete harm, and in any event is not supported by any actual evidence. Plaintiffs additionally point to declarations from some Individual Plaintiffs who claim they want to purchase semiautomatic pistols

---

[11] Five of the ten Individual Plaintiffs also allege that they have licenses to carry a concealed firearm in public. 2-ER-317–324.

with ambidextrous configurations or a more suitable grip.  AB 48; 2-ER-282–289.

Putting aside the fact that this Court previously rejected an identical argument

about ambidextrous options (*Pena*, 898 F.3d at 978, n.8), there are indeed

semiautomatic pistols on the Roster with those options, such as an ambidextrous

magazine release and an ambidextrous external safety.  *Boland* EOR, Vol. 7 at

1314–18 (photographs of some on-Roster semiautomatic pistols with ambidextrous

features from different manufacturers).[12]  Moreover, manufacturers can already

change the material, shape, or texture of the grip to an on-Roster semiautomatic

pistol and seek to add the pistol to the Roster without meeting the challenged

requirements.  Cal. Penal Code § 32030(a).  This is all in addition to the fact that

Plaintiffs can purchase at a firearms dealer any one of the nearly 500

semiautomatic pistols or over 300 revolvers currently on the Roster.  *Boland* EOR,

Vol. 3 at 450–51.

The absence of any allegation of practical harm is more significant because of

the heightened showing required to obtain a mandatory preliminary injunction.

OB 51–53.  Contrary to Plaintiffs' claim that the "injunction does not require the

State to do anything," (AB 45), the injunction effectively requires the Department

of Justice to receive a laboratory-tested sample of a semiautomatic pistol without

---

[12] There are possibly more, but not every semiautomatic pistol on the Roster was reviewed prior to the district court's preliminary injunction hearing in *Boland v. Bonta*.  *Boland* EOR, Vol. 3 at 523.

the enjoined features, verify the sample meets the UHA requirements not subject to the injunction, and notify firearms dealers that the pistol can be sold. Cal. Penal Code §§ 32010, 32015. The injunction thus operates in a way that "orders Defendant[s] to take an affirmative action" in a manner that upsets the status quo. *Doe v. Snyder*, 28 F.4th 103, 108 (9th Cir. 2022). To obtain such an injunction, Plaintiffs had to establish that "extreme or very serious damage" would result in the absence of an injunction. *Id.* at 111. They failed to do so.

## B. The Balance of Equities Weighs Against a Preliminary Injunction

This Court has concluded, and Defendant's evidence reaffirms, that chamber load indicators and magazine disconnect mechanisms improve the safety of semiautomatic pistols by reducing the likelihood of accidental shootings. *Pena*, 898 F.3d at 980; *id.* at 988 (Bybee, J., concurring in part and dissenting in part); OB 57–60; *see also Adames v. Sheahan*, 909 N.E.2d 742, 749 (Ill. 2009) (firearms manufacturer's witnesses agreeing that a magazine disconnect mechanism could have prevented an accidental shooting). Neither Plaintiffs nor the district court's order seriously dispute this or identify evidence demonstrating otherwise. AB 52–53; 1-ER-29–30.

Instead, Plaintiffs—like the district court's order (1-ER-29–30)—highlight the number of semiautomatic pistols on the Roster without chamber load indicators and magazine disconnect mechanisms, which results from the prospective nature of

those requirements. [13]  AB 53.  But the preliminary injunction, if upheld, would

swiftly and dramatically increase the proportion of semiautomatic pistols available

for retail sale without these life-saving features.  In turn, that would increase the

risk of deaths and injuries, particularly to minors, from accidental shootings.  *See*

BAmB 10–14.

It is also quite common for consumer product safety regulations to permit

products without newly required safety features to remain on the market until they

---

[13] Plaintiffs also point to the UHA's exceptions for law enforcement
agencies to support their argument that the requirements do not increase safety.
*See, e.g.*, AB 1, 53.  That is incorrect, in light of the fact that the average civilian
lacks the same level of training in the use and safe storage of firearms that law
enforcement officers have, particularly those included in the UHA exceptions.
Cal. Penal Code § 32000(b)(4), (6), (7); *see also Boland* EOR, Vol. 3 at 470
(testimony that many people do not safely store their firearms, including at
residences with minors); *id.* at 524–25 (Department of Justice special agent
supervisor explaining how he safely stores his duty weapon).  Plaintiffs also
conflate and overstate the scope of the exceptions.  AB 1.  The first exception
allows specified federal, state, and local agencies to purchase off-Roster handguns
"for use in the discharge of their official duties," and "sworn members of these
agencies" can also purchase them.  Cal. Penal Code § 32000(b)(4).  The second
exception allows specified state and local agencies or "sworn members of these
entities" to purchase an off-Roster handgun "for use as a service weapon," so long
as the sworn member completes a "live-fire qualification" every six months and
has "satisfactorily completed" the Commission on Peace Officer Standards and
Training (POST) "basic course,"—which is a minimum of 664 hours—or who
before January 1, 2021 completed the firearms portion of the same course.  Cal.
Penal Code § 32000(b)(6).  The third exception allows specified state agencies, but
not individual sworn members of the agencies, to purchase off-Roster handguns
"for use as a service weapon by the sworn members" so long as the sworn
members "satisfactorily completed" the same training requirements as those for the
second exception.  Cal. Penal Code § 32000(b)(7).

are phased out, thus allowing product manufacturers and consumers time to adjust to the new requirements. The Legislature recognized this by allowing semiautomatic pistols on the Roster before the requirements took effect to remain there and, more recently, by adding the Roster removal provision that would allow pistols with the safety features to become a proportionally larger share of pistols on the Roster. *See* Cal. Penal Code § 31910(b)(7). The number of pistols on the Roster with these safety features compared to the number that lack them does nothing to detract from the commonsense reality that these features help prevent accidental shootings.

Like the district court, Plaintiffs improperly fail to account for the harms caused by unintentional shootings and the number of individuals who (erroneously) believe a firearm cannot fire without a magazine inserted. *See* BAmB 7 (an average of 500 people were killed and over 20,000 were wounded in unintentional shootings each year between 2016 and 2020); *id.* at 8 (about 100 minors are killed and 3,000 are wounded in unintentional shootings each year); *id.* at 12–14 (highlighting statistics regarding mistaken beliefs about when a firearm is unloaded). The district court's failure to address these harms is more than a "disagree[ment] with the result" of the court's balancing of the equitable factors (AB 53), but an erroneous failure to recognize a public safety interest that this Court previously found to be substantial. *Pena*, 898 F.3d at 980. Plaintiffs also do

28

not address the public safety benefits of microstamping (OB 60–61), which this Court previously recognized (*id.* at 982).

The district court abused its discretion in evaluating the public interest and balancing the equities, by giving outsized importance to the purported harm from an alleged constitutional violation and discounting evidence of public safety harms that would result from a preliminary injunction.

## CONCLUSION

The Court should reverse the district court's order granting the preliminary injunction.

Dated: June 30, 2023           Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
ANTHONY R. HAKL
Supervising Deputy Attorney General
GABRIELLE D. BOUTIN
Deputy Attorney General

s/ *Charles J. Sarosy*

CHARLES J. SAROSY
Deputy Attorney General
*Attorneys for Defendants-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55367

I am the attorney or self-represented party.

**This brief contains** | 6,751 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Charles Sarosy | **Date** | June 30, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                            *Rev. 12/01/22*

# CERTIFICATE OF SERVICE

Case Name: **Lana Rae Renna et al. v. Rob Bonta, et al. [Appeal]**

Case No. **23-55367**

I hereby certify that on <u>June 30, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## APPELLANT'S REPLY BRIEF (PRELIMINARY INJUNCTION APPEAL – NINTH CIRCUIT RULE 3-3)

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>June 30, 2023</u>, at Los Angeles, California.

| Gail Agcaoili | |
|---|---|
| Declarant | Signature |

SA2023302191