# BENBROOK LAW GROUP

### Professional Corporation
701 UNIVERSITY AVENUE, SUITE 106
SACRAMENTO, CALIFORNIA 95825

www.benbrooklawgroup.com

TELEPHONE: (916) 447-4900
FACSIMILE: (916) 447-4904

BRADLEY A. BENBROOK                                   brad@benbrooklawgroup.com

August 22, 2023

**By CM/ECF**
Molly Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

     Re:    *Renna v. Bonta*, No. 23-55367

Dear Ms. Dwyer:

      Pursuant to Rule 28(j), Plaintiffs-Appellees join the Plaintiffs-Appellees in *Boland v. Bonta*, Case No. 23-55276, in informing the Court of *Teter v. Lopez*, No. 20-15948, where this Court invalidated Hawaii's ban on butterfly knives.

      In *Teter*, plaintiffs challenged Hawaii's ban, enacted in 1999, on a subset of knives (so-called "butterfly" knives). The panel held that the plaintiffs' proposed conduct—possessing the butterfly knives banned by the statute—was covered by the text of the Second Amendment. Op. at 18–22. The Court recognized that butterfly knives were "by necessity" included within the general category of "bladed weapons" covered by the Second Amendment's text. *Id.* at 19. The same applies here: The subset of off-Roster semiautomatic handguns banned by the UHA are "by necessity" covered by the Second Amendment since they are "arms." *Id.* (citing *Dist. of Columbia v. Heller*'s statement that the Second Amendment "extends, prima facia, to all instruments that constitute bearable arms," 554 U.S. at 582).

      The panel further held that Hawaii failed to meet its burden of proving its law was consistent with the nation's historical tradition of regulating firearms. Opp. at 22–31. Hawaii attempted to argue that the knives were "dangerous and unusual" but failed to meet its burden of establishing that they were not "commonly owned for lawful purposes." *Id.* at 22. Likewise, California has not produced any evidence that off-Roster handguns are not in common use for lawful purposes throughout the Nation. Answering Br. at 21–23; *cf.* State Opening Br. at 29–30 & n.10.

      The panel concluded that "'earlier generations addressed the societal problem' of knife violence 'through materially different means' other than outright bans on certain types of pocketknives, which goes to prove that [the Hawaii law] violates the Second Amendment." Op. at 31 (quoting *Bruen*, 142 S.Ct. at 2131). The historical record—and lack thereof—points in the same direction in this case: The risk of accidental discharge has been ever-present since the

BENBROOK LAW GROUP, PC

Molly Dwyer
Clerk of Court
August 22, 2023
Page 2

advent of firearms. California's "outright ban" of off-Roster semiautomatic handguns in common use throughout the nation is a modern, novel regulatory invention that fails *Bruen*'s test.

Sincerely,

Bradley A. Benbrook

cc: All counsel of record (by CM/ECF)

# ATTACHMENT

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANDREW TETER; JAMES GRELL, | No. 20-15948 |
| *Plaintiffs-Appellants*, | D.C. No. 1:19-cv-00183-ACK-WRP |
| v. | |
| ANNE E. LOPEZ, in her official capacity as the Attorney General of Hawaii; MARK HANOHANO, in his official capacity as the State Sheriff Division Administrator, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted February 14, 2023
Honolulu, Hawaii

Filed August 7, 2023

Before: Carlos T. Bea, Daniel P. Collins, and Kenneth K.
Lee, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Civil Rights/Second Amendment

Reversing the district court's summary judgment in favor of Hawaii officials and remanding, the panel held that Hawaii's ban on butterfly knives, Haw. Rev. State. § 134-53(a), violates the Second Amendment as incorporated against Hawaii through the Fourteenth Amendment.

The panel determined that plaintiffs had standing to challenge § 134-53(a) because they alleged that the Second Amendment provides them with a legally protected interest to purchase butterfly knives, and but for section 134-53(a), they would do so within Hawaii. Plaintiffs further articulated a concrete plan to violate the law, and Hawaii's history of prosecution under its butterfly ban was good evidence of a credible threat of enforcement.

The panel denied Hawaii's request to remand this case for further factual or historical development in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), determining that further development of the adjudicative facts was unnecessary.

The panel held that possession of butterfly knives is conduct covered by the plain text of the Second Amendment. Bladed weapons facially constitute "arms" within the meaning of the Second Amendment, and contemporaneous sources confirm that at the time of the adoption of the Second Amendment, the term "arms" was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

understood as generally extending to bladed weapons, and by necessity, butterfly knives. The Constitution therefore presumptively guarantees keeping and bearing such instruments for self-defense.

The panel held that Hawaii failed to prove that section 134-53(a) was consistent with this Nation's historical tradition of regulating weapons. The majority of the historical statutes cited by Hawaii did not ban the possession of knives but rather regulated how they were carried and concerned knives that were distinct from butterfly knives, which are more analogous to ordinary pocketknives. Hawaii cited no analogues in which Congress, or any state legislature, imposed an outright ban on the possession of pocketknives close in time to the Second Amendment's adoption in 1791, or the Fourteenth Amendment's adoption in 1868.

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Stephen D. Stamboulieh, Stamboulieh Law PLLC, Olive Branch, Mississippi; for Plaintiffs-Appellants.

Robert T. Nakatsuji (argued), First Deputy Solicitor General; Ryan M. Akamine and Caron M. Inagaki, Deputy Attorneys General; Kimberly T. Guidry, Solicitor General; Holly T. Shikada, Attorney General; Attorney General's Office; Honolulu, Hawaii; for Defendants-Appellees.

Pamela W. Bunn and Wendy F. Hanakahi, Dentons US LLP, Honolulu, Hawaii; Janet Carter, William J. Taylor, Jr., Lisa M. Ebersole, and Carina B. Gryting, Everytown Law, New

York, New York; for Amicus Curiae Everytown for Gun Safety.

Kevin O' Grady, Law Office of Kevin O'Grady LLC, Honolulu, Hawaii; David T. Hardy, Tucson, Arizona; for Amicus Curiae Hawaii Firearms Coalition.

Cody J. Wisniewski, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation.

John W. Dillon, Dillon Law Group APC, Carlsbad, California, for Amici Curiae San Diego County Gun Owners Political Action Committee, Firearms Policy Coalition, and Knife Rights Foundation Inc.

---

## OPINION

BEA, Circuit Judge:

In Hawaii, it is a misdemeanor knowingly to manufacture, sell, transfer, transport, or possess a butterfly knife—no exceptions. Haw. Rev. Stat. § 134-53(a). Because the possession of butterfly knives is conduct protected by the plain text of the Second Amendment, and because Hawaii has not demonstrated that its ban on butterfly knives is consistent with this Nation's historical tradition of regulating arms, we conclude that section 134-53(a) violates Plaintiffs' Second Amendment rights. We reverse and remand.

### I.

The butterfly knife, also known as the "balisong," has a disputed origin. Some sources say it originated in France; others, the Philippines. It is anywhere from a few hundred to

over a thousand years old. Regardless of its origin, the butterfly knife resembles an ordinary pocketknife, a tool that has been used by Americans since the early 18th century (at the very latest). *See State v. Delgado*, 692 P.2d 610, 613–14 (Or. 1984). Like a pocketknife, the butterfly knife comprises a handle and a folding blade, the cutting edge of which becomes covered by the handle when closed. Unlike a pocketknife, however, the butterfly knife's handle is split into two components. Together, these two components fully encase the blade when closed and rotate in opposite directions to open. With a few short, quick movements, an experienced user can open a butterfly knife with one hand.

Hawaii first criminalized carrying butterfly knives in 1993. *See* 1993 Haw. Sess. Laws 404. Today, its butterfly knife ban reads in relevant part:

> Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any butterfly knife, being a knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity or both, shall be guilty of a misdemeanor.

Haw. Rev. Stat. § 134-53(a).

Plaintiffs Andrew Teter and James Grell are law-abiding Hawaii residents who wish to purchase butterfly knives for self-defense. They sued Hawaii's Attorney General and Sheriff Division Administrator ("Hawaii"). Plaintiffs sought declaratory relief to establish that section 134-53(a) violates the Second Amendment and injunctive relief against its enforcement. Plaintiffs alleged that, "[b]ut for Hawaii law," they would purchase butterfly knives. Plaintiffs further

stated, in sworn declarations presented on cross-motions for summary judgment, that they owned butterfly knives before moving to Hawaii. They were "forced to dispose of" their knives because of section 134-53(a), but they would purchase butterfly knives again "[i]f Hawaii's ban were lifted." During discovery, Hawaii's deposition witness and Plaintiffs' expert witness agreed that the butterfly knife "is just a tool" that can be used offensively and defensively.

On cross-motions for summary judgment, the district court applied then-binding precedent[1] to conclude that section 134-53(a) does not violate the Second Amendment, granted Hawaii's motion, and entered judgment in its favor. We stayed Plaintiffs' appeal pending the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). After *Bruen* was decided, a motions panel ordered supplemental briefing and denied Hawaii's motion to remand. The appeal is now before us. *See* 28 U.S.C. § 1291.

## II.

We address two threshold issues before reaching the merits of this appeal. First, Hawaii argues that Plaintiffs lack standing to challenge section 134-53(a). Second, Hawaii renews its argument that we should remand for "further factual or historical development." We reject both arguments.

## A.

We first consider Article III standing. "To satisfy Article III standing, a plaintiff must show: (1) an injury in fact that

---

[1] *See United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), *abrogated by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (cleaned up). Here, the parties primarily dispute the injury in fact requirement. In particular, they disagree on the applicable framework governing that requirement in the Second Amendment context.

Citing *Jackson*, Plaintiffs contend that the forced dispossession of their butterfly knives, combined with their inability to acquire replacements, constitutes a present injury which creates Article III standing to seek declaratory and injunctive relief. *See* 746 F.3d at 967. But, citing *San Diego County Gun Rights Committee v. Reno*, Hawaii argues that this amounts to the mere "chilling" of one's ability to purchase an outlawed arm, which is not a cognizable injury. 98 F.3d 1121, 1129–30 (9th Cir. 1996), *abrogated in part by District of Columbia v. Heller*, 554 U.S. 570 (2008). In Hawaii's view, Plaintiffs have not established a present injury and must therefore satisfy the traditional requirements for a pre-enforcement challenge. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (describing those requirements); *Oklevueha Native Am. Church of Haw., Inc. v. Holder ("Oklevueha")*, 676 F.3d 829, 835 (9th Cir. 2012) (same). For reasons explained below, we conclude that Plaintiffs have established standing to challenge section 134-53(a) under both *Jackson* and *Driehaus*.

1.

The plaintiff in *Jackson* sought to enjoin San Francisco's ban on the sale of hollow-point ammunition. 746 F.3d at 958.

San Francisco argued that Jackson had "not suffered an injury in fact because she could easily obtain hollow-point ammunition outside San Francisco." *Id.* at 967. We disagreed. We held that Jackson established an injury in fact because she "allege[d] that the Second Amendment provide[d] her with a legally protected interest to purchase hollow-point ammunition, and that but for [the ban], she would do so within San Francisco." *Id.* (cleaned up). Jackson had not been threatened with prosecution under the ban—which prohibited only the *transfer* of such ammunition in San Francisco, not its *possession*—and we required no proof of such prosecution before concluding that she had suffered a cognizable injury.**²**

So too here. Plaintiffs allege in their complaint that, "[b]ut for Hawaii law," they would purchase butterfly knives, an allegation which mirrors the one found adequate in *Jackson*. Plaintiffs stated in sworn declarations that they were "forced to dispose of" their butterfly knives because of section 134-53(a) and that, "[i]f Hawaii's ban were lifted," they would purchase replacements. As in *Jackson*, Plaintiffs "allege[] that the Second Amendment provides [them] with a legally protected interest to purchase [butterfly knives], and that, but for section [134-53(a)], [they] would do so

---

² *Jackson* has been interpreted as holding that an "ongoing deprivation of an alleged legally protected interest, [one's] Second Amendment rights, is sufficient to constitute an injury in fact." *Sullivan v. Ferguson*, No. 3:22-CV-05403-DGE, 2022 WL 13969427, at *5 (W.D. Wash. Oct. 24, 2022). Although *Sullivan* is not binding, its understanding of *Jackson* comports with our recognition that a threat of prosecution is unnecessary to prove standing where the plaintiffs' injury is "not a hypothetical risk of prosecution but rather actual, ongoing . . . harm resulting from their" adherence to the challenged statute. *National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002).

within [Hawaii]." *Id.* Accordingly, *Jackson* compels the conclusion that "section [134-53(a)] constitutes an injury in fact to [Plaintiffs], and [they have] standing to challenge it." *Id.*

Hawaii's reliance on *San Diego County* for the contrary proposition is misplaced.

Decided in 1996—before *Heller*—*San Diego County* involved a challenge to the federal Crime Control Act of 1994 ("CCA"). 98 F.3d at 1124. The plaintiffs argued that they had standing to enjoin the CCA's enforcement because they "'wish[ed] and intend[ed]' to engage in unspecified conduct prohibited by the [CCA]." *Id.* In concluding that the plaintiffs lacked standing, we stated that "the chilling of [the plaintiffs'] desire and ability to purchase outlawed firearms" was not a cognizable injury. *Id.* at 1129–30. Instead, we required the plaintiffs to identify some other injury-in-fact, which they failed to do. *Id.* at 1126–31. Hawaii argues that *San Diego County* forecloses any reliance on *Jackson*. We disagree.

As relevant here, *San Diego County* addressed a narrow question—whether a subjective, unspecified "chilling" of one's ability to acquire an arm constituted an injury in fact. *Id.* at 1124, 1129–30. Plaintiffs here do not allege that their ability to purchase butterfly knives has been "chill[ed]." *Id.* at 1129–30. The sale of butterfly knives is completely banned in the Hawaiian Islands. *See* Haw. Rev. Stat. § 134-53(a). As Hawaii residents, Plaintiffs are completely unable to acquire the arms that they allege are protected by the Second Amendment, which places this case within the confines of *Jackson*, not *San Diego County*.

And to the extent *San Diego County* could be read as contradicting *Jackson*, it has been abrogated. When *San*

*Diego County* was decided, our precedent held that "the Second Amendment [was] a right held by the states, and [did] not protect the possession of a weapon by a private citizen." 98 F.3d at 1124 (cleaned up).**[3]** In other words, to the extent *San Diego County* categorically held that a plaintiff cannot be injured by his inability "to purchase outlawed firearms," *id.* at 1129–30, that was because our precedent had not yet recognized *any* individual right to keep and bear arms, *id.* at 1124. Of course, that precedent is "clearly irreconcilable," *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003), with *Heller*'s recognition of the individual right to keep and bear arms. 554 U.S. at 595.

Hawaii's broad reading of *San Diego County* is also irreconcilable with *Teixeira v. County of Alameda*, which adopted *Jackson*'s conclusion that the Second Amendment protects "the ability to acquire arms." 873 F.3d 670, 677–78 (9th Cir. 2017) (en banc).**[4]** Thus, we conclude that *Heller* and *Teixeira* foreclose Hawaii's attempt to expand *San*

---

[3] It was for this reason that the district court in *Jackson* noted that *San Diego County*'s standing analysis was of "uncertain" ongoing validity. *Jackson v. City & Cnty. of San Francisco*, 829 F. Supp. 2d 867, 871 (N.D. Cal. 2011).

[4] In *Teixeira*, a "would-be operator of a gun store" challenged a zoning ordinance that limited gun store locations in Alameda County. 873 F.3d at 673–75, 678. In summarizing the scope of the Second Amendment right, *Teixeira* cited *Jackson*, explaining that "the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Id.* at 677 (cleaned up). Accordingly, Teixeira "ha[d] derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers." *Id.* at 678. We conducted no threat-of-prosecution analysis in reaching this conclusion.

*Diego County*'s holding in a manner that would contradict *Jackson*.

Because *Jackson* compels the conclusion that Plaintiffs have established an injury in fact, it is not apparent that we must analyze the traditional requirements for a pre-enforcement challenge. *See Nat'l Audubon Soc'y*, *Inc*., 307 F.3d at 855. But for the sake of thoroughness, we choose to "consider the familiar preenforcement claim ripeness analysis" to this case. *Oklevueha*, 676 F.3d at 835 (internal quotation marks omitted). We reach the same result under Hawaii's theory of the case, which requires Plaintiffs to prove a justiciable threat of prosecution.

2.

To establish a justiciable threat of prosecution, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159. Plaintiffs have alleged such an intention. Each Plaintiff declared under penalty of perjury that he wishes to purchase a butterfly knife, and would do so but for Hawaii's ban. That conduct is arguably affected with a constitutional interest—Plaintiffs' Second Amendment rights—and is proscribed by the statute here. *See* Haw. Rev. Stat. § 134-53(a). And there is a credible threat of enforcement under Hawaii's law. Since 2012, roughly 30 people have been arrested or issued a citation for possessing a butterfly knife. Hawaii's "history of past enforcement" is "good evidence" that future enforcement is likely. *Driehaus*, 573 U.S. at 164.

Citing *San Diego County*, Hawaii contends that Plaintiffs must go further and show a "genuine threat of imminent prosecution," which *San Diego County* suggests

would include a showing as to the "particular time or date on which plaintiffs intend to violate" the challenged statute. 98 F.3d at 1126–27. But these stricter requirements in *San Diego County* cannot be reconciled with *Driehaus*'s rejection of the Sixth Circuit's similar view in that case, and these aspects of *San Diego County* are therefore no longer good law. *See Miller*, 335 F.3d at 899–900. As *Driehaus* makes clear, all that is required is that the plaintiff establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a *credible threat* of prosecution." 573 U.S. at 159 (emphasis added). *Driehaus* also confirms that exact dates and times are not necessary and that it is sufficient on that score to identify, as Plaintiffs have done here, the specific conduct (here, the acquisition and possession of butterfly knives) that they affirmatively intend to engage in if Hawaii's criminal prohibition is invalidated. *Id.* at 161.

Hawaii also argues that Plaintiffs have failed to establish standing under the three-factor test we use "to determine whether plaintiffs have shown . . . a credible threat" under *Driehaus*. *See Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022). Those factors are: "[1] whether the plaintiffs have articulated a concrete plan to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Id*. Consideration of these factors confirms that Plaintiffs have sufficiently established a credible threat of prosecution.

Here, Plaintiffs "have articulated a concrete plan to violate the law in question." *Id.* They have stated, under penalty of perjury, that they previously possessed butterfly

knives but were forced to dispose of them because of Hawaii's ban. They further declared that they wish to purchase replacement butterfly knives and would do so were the law not in place. Based on Plaintiffs' disposal of their butterfly knives and their stated desire to purchase replacements, it is clear that their commitment to engage in conduct prohibited by Hawaii's ban is no mere "'some day' intention[]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Moreover, Hawaii's history of prosecution under its butterfly knife ban, is "good evidence" of a credible threat of enforcement. *Driehaus*, 573 U.S. at 164.

Hawaii's suggestion that a plaintiff must *always* prove "a specific warning or threat to initiate proceedings" has no basis in our precedent. These factors must be considered as a whole, in light of the totality of the circumstances, and not as a mandatory checklist. *See Unified Data Servs., LLC*, 39 F.4th at 1210–11; *Oklevueha*, 676 F.3d at 836 (finding standing even though the "[p]laintiffs [did] not allege *any* threat of prosecution" (emphasis added)). On balance, we conclude that Plaintiffs have established a credible threat of enforcement of section 134-53(a), and therefore have established an injury in fact under *Driehaus*.

The remaining elements of standing are not seriously disputed. The injury Plaintiffs complain of is directly traceable to the defendants, who are the officials responsible for enforcement of Hawaii's butterfly knife ban. *Lujan*, 504 U.S. at 560. And their injury would be redressed by a remedy that the district court could provide them, namely, an injunction against enforcement. *Id*. at 561. We are therefore satisfied that Plaintiffs have met the requirements for Article III standing.

### B.

Second, we deny Hawaii's request for a remand. Hawaii has not explained what further factual development necessitates this relief. At oral argument, Hawaii's counsel argued that further *historical* research is needed in light of *Bruen*. Oral Arg. at 14:58–16:50. But the historical research required under *Bruen* involves issues of so-called "legislative facts"—those "which have relevance to legal reasoning and the lawmaking process," such as "the formulation of a legal principle or ruling by a judge or court"—rather than adjudicative facts, which "are simply the facts of the particular case." Fed. R. Evid. 201, advis. comm. note (1972 proposed rules). Because the issue does not require further development of adjudicative facts to apply *Bruen*'s new standard, it does not trigger our "standard practice" in favor of remanding when an intervening change in law requires additional inquiry concerning adjudicative facts. *See Detrich v. Ryan*, 740 F.3d 1237, 1248–49 (9th Cir. 2013) (en banc) (plurality opinion), *overruled on other grounds by Shinn v. Ramirez*, 142 S. Ct. 1718 (2022). And even when that presumption in favor of remand applies, we need not do so when "we can confidently decide [the issue] ourselves." *Id*. at 1249. This is such a case. As we explain below, Hawaii has never cited an on-point historical analogue to section 134-53(a) even after having an

opportunity to do so before both motions and merits panels.[5]
We therefore decline to remand.[6]

Having cleared these two threshold hurdles, we now
address the merits of this appeal.

### III.

Plaintiffs appeal the district court's grant of summary
judgment to Hawaii, as well as the denial of their own
motion for summary judgment. "When the district court
disposes of a case on cross-motions for summary judgment,
we may review both the grant of the prevailing party's
motion and the corresponding denial of the opponent's
motion." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d
1190, 1202 (9th Cir. 2012) (cleaned up). Specifically, we
must determine whether section 134-53(a) violates rights
guaranteed by the Second Amendment, which is a question
we review *de novo*. *United States v. Oliver*, 41 F.4th 1093,
1097 (9th Cir. 2022).

The Second Amendment guarantees the individual right
to keep and bear arms, *Heller*, 554 U.S. at 592, and is
incorporated against Hawaii through the Due Process Clause

---

[5] As explained *infra* section III.C., Hawaii's best historical analogue did
not completely bar all possession of a type of knife. *See* 1837 Ga. Laws
90.

[6] Hawaii is not entitled to a remand on the ground that it should be given
a further opportunity to establish a factual record for its position that
butterfly knives may be prohibited based on what it contends is *Heller*'s
"categorical exception[]" for "dangerous and unusual" weapons. By its
terms, this argument rests on the pre-*Bruen* decision in *Heller*, and
Hawaii already had a full opportunity to put forward a record as to why
butterfly knives should be considered to be "dangerous and unusual" in
the sense claimed. We address the merits of Hawaii's contention on this
score below. *See infra* at 20–22.

of the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). Before analyzing the parties' Second Amendment arguments, we discuss *Bruen*.

A.

*Bruen* abrogated the two-step approach we had adopted following *Heller* and *McDonald* to analyze Second Amendment challenges. *See, e.g.*, *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), *abrogated by Bruen*, 142 S. Ct. 2111. Under our pre-*Bruen* approach, we would: (1) determine whether the challenged law affects conduct historically protected by the Second Amendment; and (2) if so, apply varying levels of scrutiny to review the constitutionality of the arms regulation, depending on how close the conduct affected by the law lay to the "core" of the Second Amendment right to "keep and bear arms." *E.g.*, *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895. *Bruen* rejected this two-step test, reasoning that it was "one step too many." 142 S. Ct. at 2127. Instead, *Bruen* held

> that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the

> individual's conduct falls outside the Second
> Amendment's "unqualified command."

*Id.* at 2126 (cleaned up). Although *Bruen* discussed "firearm regulation[s]," that was because the arm at issue in that case was a firearm. We see no reason why the framework would vary by type of "arm."

Applying the above standard, the first question in *Bruen* was "whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. In answering it, *Bruen* analyzed only the "Second Amendment's text," applying ordinary interpretive principles. *Id.* at 2134–35. Because the word "'bear' naturally encompasses public carry," the Court concluded that the conduct at issue in *Bruen* (public carry) was protected by the plain text of the Second Amendment. *Id.* at 2143.

The second question addressed in *Bruen* was whether New York had met its burden in proving its "proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. In answering this second question, *Bruen* noted that "not all history is created equal." *Id.* at 2136. It reasoned that the most apposite historical sources from which to derive a comparable historical analogue to the challenged statute are those close in time to 1791 (when the Second Amendment was ratified)

or 1868 (when the Fourteenth Amendment was ratified). *Id.* at 2136–38.**[7]**

We similarly structure our analysis. First, we examine whether possession of butterfly knives is conduct covered by the plain text of the Second Amendment. Concluding that it is, we then analyze whether Hawaii has demonstrated that its complete prohibition of that conduct is consistent with this Nation's historical tradition of regulating arms.

### B.

We first consider whether the possession of butterfly knives is protected by the plain text of the Second Amendment. The plain text provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

In *Heller*, the Supreme Court held that a handgun was an "arm" within the meaning of the Second Amendment. 554 U.S. at 581, 628–29. In reaching that conclusion, the Court began by noting that, as a general matter, the "18th-century meaning" of the term "arms" is "no different from the meaning today." *Id*. at 581. Then, as now, the Court explained, the term generally referred to "[w]eapons of

---

[7] *Bruen* observed that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." 142 S. Ct. at 2138. Because this debate is not relevant to the disposition of this appeal, we express no view on it.

offence, or armour of defence." *Id*. (cleaned up). The Court further noted that all relevant sources of the original public meaning of "arms" agreed that "all firearms constituted 'arms'" within the then-understood meaning of that term. *Id*. The Court emphasized that it is irrelevant whether the particular type of firearm at issue has military value, because the term "arms" "was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity." *Id*. And, just as the scope of protection afforded by other constitutional rights extends to modern variants, so too the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582.

We similarly conclude that, just as with firearms in *Heller*, bladed weapons facially constitute "arms" within the meaning of the Second Amendment. Like firearms, bladed weapons fit the general definition of "arms" as "[w]eapons of offence" that may be "use[d] in wrath to cast at or strike another." *Id.* (cleaned up). Moreover, contemporaneous sources confirm that, at the time of the adoption of the Second Amendment, the term "arms" was understood as generally extending to bladed weapons. *See* 1 Malachy Postlethwayt, The Universal Dictionary of Trade and Commerce (4th ed. 1774) (including among "arms" fascines, halberds, javelins, pikes, and swords). Because the plain text of the Second Amendment includes bladed weapons and, by necessity, butterfly knives, the Constitution "presumptively

guarantees" keeping and bearing such instruments "for self-defense." *Bruen*, 142 S. Ct. at 2135.**8**

Hawaii presents two arguments to the contrary. First, Hawaii argues that only "ordinary, law-abiding, adult citizens" are included among "the people" referenced in the Second Amendment's plain text. From there, it argues that "banning weapons associated with criminals"—such as, in Hawaii's view, butterfly knives—"should not violate the Second Amendment." This argument fails because Hawaii's ban is not limited to criminals. *See* Haw. Rev. Stat. § 134-53(a). Indeed, the uncontroverted evidence in the record shows that *these* plaintiffs are not criminals, so this defense would not resolve their claims.**9**

Second, we similarly reject Hawaii's argument that the purported "dangerous and unusual" nature of butterfly knives means that they are not "arms" as that term is used in the Second Amendment. *Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the "*historical tradition* of prohibiting the carrying of

---

[8] Some state courts before *Heller* excluded many types of bladed weapons from the "arms" protected by the Second Amendment on the ground that they assertedly were not suited for military use. *See State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891); *English v. State*, 35 Tex. 473, 476–77 (1871); *see also Strickland v. State*, 72 S.E. 260, 261–62 (Ga. 1911) (collecting cases). That reasoning is now squarely foreclosed by *Heller*, 554 U.S. at 581–82 (explicitly rejecting the view that the "arms" protected by the Second Amendment are limited to those "specifically designed for military use" or "employed in a military capacity"). Moreover, at oral argument, Hawaii's counsel conceded that "knives, in general, can qualify as arms." Oral Arg. at 18:35.

[9] Because section 134-53(a) is not limited to disarming criminals, we do not address the question whether criminals are included among "the people" referenced the Second Amendment's text.

dangerous and unusual weapons." 554 U.S. at 627 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not *arms*. Thus, whether butterfly knives are "dangerous and unusual" is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis.

Because the historical tradition of prohibiting the carry of dangerous and unusual weapons was recognized in *Heller*, Hawaii had more than an ample opportunity to present arguments to the district court that butterfly knives are of that type. And Hawaii, in fact, proffered some evidence to that effect. Indeed, this appears to have been Hawaii's *primary* argument below; at the summary judgment hearing, Hawaii's counsel stated that "our initial argument is that the butterfly knife is a dangerous and unusual weapon." But Hawaii failed to present evidence sufficient to create a genuine issue of material fact as to whether butterfly knives are dangerous and unusual.

To determine whether a weapon is dangerous and unusual, "we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. The record does not support a conclusion that the butterfly knife has uniquely dangerous propensities. The butterfly knife is simply a pocketknife with an extra rotating handle. The ability of an experienced user to expose the blade with one hand is not the sort of "astonishing innovation" that "could not have been within the contemplation of the constitutional drafters." *Delgado*, 692 P.2d at 614.

There similarly is no genuine issue of material fact as to whether butterfly knives are commonly owned for lawful purposes. Most notably, Hawaii's own witness conceded that butterfly knives may be used for self-defense. Moreover, in opposing passage of section 134-53(a), Hawaii's Public Defender's Office presented testimony that "butterfly knives . . . are an integral part of the [F]ilipino martial art called Escrima," and an Escrima instructor testified to teaching the use of the balisong in martial arts for over a decade.**[10]** In opposition, Hawaii cites some conclusory statements in the legislative history claiming that butterfly knives are associated with criminals. We give little weight to these statements. Common sense tells us that *all* portable arms are associated with criminals to some extent, and the cited conclusory statements simply provide no basis for concluding that these instruments are not commonly owned for lawful purposes. Aside from these conclusory legislative statements, Hawaii has submitted no evidence that butterfly knives are not typically possessed by law-abiding citizens for self-defense.

Having rejected Hawaii's arguments to the contrary, we conclude that the possession of butterfly knives is conduct covered by the plain text of the Second Amendment.

C.

Because the possession of butterfly knives is covered by the plain text of the Second Amendment, Hawaii must prove that section 134-53(a) is consistent with this Nation's historical tradition of regulating weapons. *Bruen*, 142 S. Ct.

---

[10] "Esgrima" is the Spanish word for "fencing." *The Oxford Spanish Dictionary* 344 (Beatriz Galimberti Jarman, Roy Russell, Carol Styles Carvajal & Jane Horwood eds., 3d ed. 2003).

at 2126–27, 2135. Hawaii may meet its burden by citing analogous regulations that were enacted close in time to the Second Amendment's adoption in 1791 or the Fourteenth Amendment's adoption in 1868. *Id.* at 2136–38. "Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years," and "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. Hawaii must derive from these sources a "proper [historical] analogue" to section 134-53(a). *Id.* at 2132.

In this historical-analogue inquiry, we cannot "uphold every modern law that remotely resembles a historical analogue." *Id.* at 2133. "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* In determining whether the modern regulation and the historical analogue are "relevantly similar," we must look to the "how and why" of the two regulations; that is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2132–33. (cleaned up).

Hawaii argues that section 134-53(a) is analogous to a number of state statutes stretching back to 1837, which regulated "Bowie knives," "Arkansas Toothpicks," "slung-shots," metal knuckles, sword-canes, and other so-called "deadly weapons."[11] Hawaii argues that these statutes evince

---

[11] The bowie knife has a large, fixed blade that is sharp on one side and generally longer than nine inches. David B. Kopel et al., *Knives and the*

an historical tradition of banning weapons associated with criminality. We disagree that these statutes are proper historical analogues to section 134-53(a).

As *Bruen* put it, the "how" of the proffered state statutes is different—they regulate different conduct. 142 S. Ct. at 2133. The vast majority of the statutes cited by Hawaii did not ban the possession of knives; they regulated only their *carry*. True, four of these statutes (by our count) banned the possession of slung-shots, metal knuckles, and an undefined category of "deadly weapons." *See supra* note 11. But no statute cited by Hawaii categorically banned the possession of any type of pocketknife.

Hawaii's best historical analogue is an 1837 Georgia statute. That statute states that no one shall "keep, or have about or on their person or elsewhere . . . Bowie, or any other kind of knives." 1837 Ga. Laws 90. It is not apparent to us that "other kind[s] of knives," would have been understood to include pocketknives. Even so, the Georgia

---

*Second Amendment*, 47 U. Mich. J.L. Reform 167, 180 (2013). The Arkansas Toothpick has a "triangular blade[] up to eighteen inches long, sharpened on both edges." *Id.* at 181. The slung-shot, also known as a "monkey's fist," is composed of a rope tied into a large, dense knot covering a heavy weight. It was traditionally used as a maritime tool to cast a line from one location to another. But it was also used as a weapon, similar to how one might use a flail. *See, e.g.*, 1849 N.Y. Laws 403 (banning the sale and possession of "slung shot[s]"); 1849 Vt. Acts & Resolves 26 (same); 1850 Mass. Acts 401 (banning the manufacture and sale of "slung shot[s]"); 1872 Ala. Laws 130 (banning the concealed carry of slung-shots or brass knuckles); 1881 Ill. Laws 73 (banning the sale and possession of a "slung-shot or metallic knuckles, or other deadly weapon"); 1917 Cal. Stat. 221 (banning the sale and possession of "slungshot[s]" or other deadly weapons); 1917 Minn. Laws 354 (banning the manufacture and sale of "slung-shot[s], sand club[s], or metal knuckles").

statute must have permitted at least *some* possession of knives because it provided an exception for open carry. *Id.* It thus was substantially less restrictive than the Hawaii statute at issue here. And even if it were analogous to section 134-53(a), one solitary statute is not enough to demonstrate a *tradition* of an arms regulation. *Bruen*, 142 S. Ct. at 2153.

Of the remaining knife-regulating statutes cited by Hawaii, the most restrictive category banned the *sale* of bowie knives, Arkansas Toothpicks, dirks, or daggers.[12] The second-most restrictive category banned the *carry* of such weapons, concealed or otherwise.[13] But even these two categories are outliers.

The vast majority of the statutes cited by Hawaii prohibited the *concealed carry* of bowie knives, Arkansas Toothpicks, dirks, daggers, or other "deadly weapons."[14]

---

[12] *E.g.*, 1837 Ga. Laws 90; 1838 Tenn. Pub. Acts 200; 1878 Miss. Laws 175 (prohibiting sales only as to minors and intoxicated persons); 1881 Ill. Laws 73 (prohibiting transfers of knives only as to minors); 1890 Okla. Sess. Laws 495 (prohibiting transfers only as to minors); 1882 W. Va. Acts 421 (prohibiting transfers only as to minors); 1917 Cal. Stat. 221 (prohibiting the manufacture or transfer of certain weapons, including dirks and daggers).

[13] *See*, *e.g.*, 1871 Tex. Gen. Laws 25; 1875 Ark. Acts 156; 1882 W. Va. Acts 421; 1890 Okla. Sess. Laws 495; 1917 Cal. Stat. 221 (prohibiting the carry of dirks or daggers).

[14] *E.g.*, 1837 Ga. Laws 90; 1838 Tenn. Pub. Acts 200–01; 1838 Va. Acts 76 (prohibiting only "habitual[]" concealed carry); 1838 Ala. Laws 67; 1855 La. Acts 148; 1859 Ind. Acts 129; 1859 Ohio Laws 56; 1864 Cal. Stat. 115; 1873 Neb. Laws 724; 1872 Wis. Sess. Laws 17; 1873 W. Va. Acts 709 (prohibiting only "habitual[]" concealed carry); 1878 Miss. Laws 175; 1879 Ill. Laws 114–15; 1879 N.C. Sess. Laws 231; 1880 S.C. Acts 447–48; 1881 Ill. Laws 74; 1884 Va. Acts 180; 1885 Or. Laws 33;

Other statutes were even more targeted. Some prohibited carry by certain individuals,[15] carry in certain places at certain times,[16] or carry for certain purposes,[17] and still

1886 Md. Laws 602; 1887 Mich. Pub. Acts 144; 1893 R.I. Pub. Laws 231–32; 1909 N.J. Laws 34–35.

[15] *E.g.*, 1868 Kan. Sess. Laws 378 (prohibiting carry by persons "not engaged in any legitimate business," intoxicated persons, and rebels); 1878 Miss. Laws 176 (prohibiting concealed carry by students).

[16] *E.g.*, 1870 La. Acts 159–60 (prohibiting carry of weapons near polling places on election days); 1870 Tex. Gen. Laws 139 (same); 1871 Tex. Gen. Laws 25–26 (prohibiting carry in religious assemblies, schools, and public gatherings); 1874 Mo. Laws 43 (prohibiting concealed carry in churches, schools, election precincts on election days, and courtrooms); 1875 Va. Acts 102 (prohibiting carry in any "place of public worship during the time of holding any meeting for religious worship" and on "Sunday, at any place other than his own premises, except for good and sufficient cause"); 1892 Vt. Acts & Resolves 95 (prohibiting carry at schools).

[17] *E.g.*, 1851 Pa. Laws 382 (prohibiting "wilfully [*sic*] and maliciously" carrying dirk knives); 1859 Ind. Acts 129 (prohibiting open carry "with the intent or avowed purpose of injuring [a] fellow man"); 1866 N.Y. Laws 810–11 (prohibiting concealed carry "with intent to use against any other person" and establishing that concealed carry is "presumptive evidence" of such intent); 1875 Pa. Laws 33 (prohibiting concealed carry "with the intent therewith unlawfully and maliciously to do injury to any other person" and establishing that concealed carry may be evidence of such intent); 1886 Md. Laws 602 (prohibiting open carry "with the intent or purpose of injuring any person"); 1892 Vt. Acts & Resolves 95 (prohibiting carry "with the intent or avowed purpose of injuring a fellow man"); 1915 N.D. Laws 96 (prohibiting concealed carry for an unlawful or illegitimate purpose and establishing that concealed carry is "presumptive evidence" of such intent); 1917 Cal. Stat. 222 (prohibiting carry of certain knives "with intent to use the same unlawfully against another"); 1917 Minn. Laws 354 (prohibiting carry of certain knives "with intent" to "use against another" and establishing that concealed carry is presumptive evidence of such intent).

others regulated dangerous conduct, such as dueling with a weapon.**[18]** Many of these statutes excepted the carry of prohibited weapons for self-defense, for "lawful purposes," while traveling, or in their owners' homes.**[19]**

---

[18] *E.g.*, 1837 Miss. Laws 289–90; 1837 Ala. Laws 7 ("[I]f any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks . . . on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder . . . ."); 1850 Mass. Acts 401 (providing an enhanced penalty for persons arrested while carrying dangerous weapons); 1855 Cal. Stat. 152 (penalizing dueling with certain weapons if it results in death); 1875 Ind. Acts 62 (prohibiting "drawing or threatening to use" certain weapons); 1861 Nev. Stat. 61 (elevating killing a person with certain weapons during a duel to murder); 1868 Fla. Laws 95 (providing an enhanced penalty for persons arrested while carrying dangerous weapons); 1877 Mo. Laws 240 (prohibiting "exhibit[ing]" certain weapons "in a rude, angry or threatening manner"); 1877 N.H. Laws 38 (providing an additional penalty when a "dangerous weapon[]" is found during arrest for a separate offense); 1879 Ill. Laws 114–15 (prohibiting display of a weapon "in a threatening manner"); 1881 Ill. Laws 74 (prohibiting display of a weapon "in a threatening or boisterous manner").

[19] *E.g.*, 1837 Miss. Laws 292 (criminalizing exhibiting certain types of knives in a "rude, angry and threatening manner" unless it was "in necessary self defence"); 1859 Ind. Acts 129 (exception for travelers); 1859 Ohio Laws 56–57 (providing a defense to conviction if the jury concluded that, "at the time of carrying any of the weapon or weapons aforesaid . . . the circumstances in which [defendant] was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family" and that the defendant was "engaged in the pursuit of any lawful business"); 1861 Nev. Stat. 62 (criminalizing exhibiting certain types of knives "in a rude, angry, and threatening manner, not in necessary self-defense"); 1864 Cal. Stat. 115 (exception for travel); 1871 Tex. Gen. Laws 25 (banning any person from carrying bowie knives or dirks "unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing"

Notably, the cited statutes regulated kinds of knives that are distinct from butterfly knives. The butterfly knife is clearly more analogous to an ordinary pocketknife than to an Arkansas Toothpick or a bowie knife. And none of the statutes cited by Hawaii prohibited the carry of pocketknives, much less their possession outright. Four of these statutes, in fact, exempted pocketknives by name.[20]

---

and also excepting carrying weapons at one's home or business or while traveling); 1872 Wis. Sess. Laws 17–18 (exception to a concealed carry prohibition if the defendant "had reasonable cause to fear an assault" or if "his possession of such weapon was for a temporary purpose, and with harmless intent"); 1873 Neb. Laws 724–25 (exempting the carry of knives "in the pursuit of any lawful business" in circumstances "such as to justify a prudent man in carrying the weapon . . . for the defense of his person, property, or family"); 1875 Ark. Acts 156 (prohibiting the carry of certain kinds of knives except on people's "own premises" or when "traveling through the country"); 1875 Ind. Acts 62 (criminalizing "drawing or threatening to use" weapons unless done "in defense of . . . person or property"); 1877 Mo. Laws 240 (criminalizing the brandishing of weapons "in a rude, angry or threatening manner, not in the necessary defence of his person, family or property"); 1878 Miss. Laws 175 (criminalizing carry only when not "threatened with, or having good and sufficient reason to apprehend an attack, or traveling"); 1879 N.C. Sess. Laws 231 (allowing concealed carry on a person's own premises); 1880 S.C. Acts 448 (same); 1882 W. Va. Acts 421–22 (exception for defendants who had "good cause to believe . . . that he was in danger of death or great bodily harm"); 1890 Okla. Sess. Laws 495 (exceptions for hunting, "public muster or military drills," and traveling); 1909 N.J. Laws 34–35 (exceptions for licensed carry, carry in, to, or from one's home and business, and carry for hunting); 1915 N.D. Laws 96 (exception for carrying concealed weapons "to effect a lawful and legitimate purpose").

[20] *E.g.*, 1866 N.Y. Laws 810–11 (prohibiting concealed carry of "any dirk or dagger (not contained as a blade of a pocket-knife)"); 1868 Fla. Laws 95 (prohibiting the carry of "any dirk, pistol, or other arm or

This historical background makes our analysis relatively "straightforward." *Bruen*, 142 S. Ct. at 2131. *Bruen* explained that

> when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

*Id.*

Here, the 1999 Hawaii Legislature addressed the perceived social problem of an "increasing trend in minors and gang members armed with knives and daggers," who preferred butterfly knives "as they are easy to conceal and are more intimidating when brandished." But the problem of people using easily concealable, foldable knives in violent crimes predates 1999 by hundreds of years:

> Of the many varieties of knives, none has been a more constant or enduring companion to man than the pocket knife. Specimens of

---

weapon, except a common pocket knife"); 1885 Or. Laws 33 (prohibiting concealed carry of "any knife (other than an ordinary pocket-knife)"); 1886 Md. Laws 602 (prohibiting concealed carry of "dangerous or deadly weapon[s] of any kind whatsoever, (penknives excepted)").

> folding pocket knives have been discovered
> in Roman archeological sites, indicating that
> such knives were popular at least from the
> first century A.D. They have been
> manufactured for their utility as both
> instruments of labor and combat. One of the
> most common of the specific named knives is
> the jackknife, a word of uncertain origin,
> which was a large single-bladed folding
> knife, ranging in size from four to seven
> inches when closed. By the early 1700s,
> when the eastern seaboard had become a
> highly settled area with large towns and cities
> and relatively good roads, men normally
> carried a folding pocket knife. Even when
> they joined the American army during the
> revolution, the knife they carried was the
> jackknife, which was mentioned frequently
> in colonial records. During the American
> Revolution at least two states, New
> Hampshire and New York, required their
> militiamen to carry a jackknife. . . . The
> folding pocketknife, in particular, since the
> early 18th century has been commonly
> carried by men in America and used
> primarily for work, but also for fighting.

*Delgado*, 692 P.2d at 613–14.

Thus, section 134-53(a) purports to "address[] a general societal problem" of easily concealable, foldable knives being used in crimes—a problem that "has persisted since the 18th century." *Bruen* 142 S. Ct. at 2131. But Hawaii cites no analogues in which Congress or any state legislature

imposed an outright ban on the possession of pocketknives to remedy this problem near 1791 or 1868. "[E]arlier generations addressed the societal problem" of knife violence "through materially different means" other than outright bans on certain types of pocketknives, which goes to prove that section 134-53(a) violates the Second Amendment. *Id.*

## IV.

We conclude that section 134-53(a) violates the Second Amendment as incorporated against Hawaii through the Fourteenth Amendment. We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**